1  Robert C. Pearman, Jr., Esq.
   rpllp@znet.com
2  Tel (213) 533-4125
3  Fax (213) 533-4126

4  Gerald Greene, Esq.
   gergreene@earthlink.net
5  Tel (213) 996-8484
6  Fax (213) 996-8483

7  ROBINSON & PEARMAN LLP
   555 West 5th Street, 31st Floor
8  Los Angeles, California 90013

9

10  Attorneys for Plaintiff
    KING TUNA, INC.
11

12            UNITED STATES DISTRICT COURT

13            CENTRAL DISTRICT, CALIFORNIA

14

15  KING TUNA, INC. a California    )  CIVIL NO.: CV07-07451 ODW
    corporation,                    )                              (JWJx)
16                                  )
                                    )       COMPLAINT
17              Plaintiff,          )
                                    )  LANHAM ACT (False Advertising
18        vs.                       )     15 U.S.C. §1125(a))
                                    )
19  ANOVA FOOD, INC., a Georgia     )    (Patent False Marking,
    corporation,                    )       35 U.S.C. §292)
20                                  )
                Defendants.         )  UNLAWFUL TRADE PRACTICES STATE
21                                  )    CLAIM (CA Bus & Prof Code
                                    )            §17200)
22                                  )
                                    )       EXHIBITS 1-6
23  _____ )
                                    )    DEMAND FOR JURY TRIAL
24

25

26

27

28

                              -1-

Plaintiff King Tuna, Inc. ("King Tuna") files this Complaint against Defendant Anova Food, Inc. ("Anova") for unfair trade practices and false advertising under the Lanham Act, 15 U.S.C. 1051 et seq., and California Business & Professions Code §17200 et seq., and alleges the following:

## JURISDICTION & VENUE

1.  Pursuant to 28 U.S.C. §1331 and 28 U.S.C. §1338, this court has jurisdiction over the subject matter of this action. Pursuant to 28 U.S.C. §1367, this court has supplemental jurisdiction over the state law claim because this claim is related to, and forms part of the same case or controversy as, the federal question claims.

2.  Venue in this district is proper under 28 U.S.C. § 1391 and 28 U.S.C. §1400(b).

## THE PARTIES

3.  King Tuna is a California corporation with a principal place of business in Los Angeles, California.

4.  On information and belief, Anova is a Georgia corporation with a principal place of business in Atlanta, Georgia.

## BACKGROUND

5.  King Tuna offers processed seafood products for sale throughout the Western United States.  A primary business for King Tuna is the sale of sashimi grade raw tuna.

6.   Anova is a business competitor of King Tuna, and "sells fresh and frozen seafood products . . . throughout the United States." *See* **Complaint**, **Para. 9**, *Anova v. Hawaii International Seafood*, Civ. No. 1:04-CV-0775 (N.D. Ga. 2004). Although Anova sells a variety of seafood products, tuna products represent a substantial portion of Anova's overall business. Anova devotes an entire Internet domain (www.anovafoodinc.com) to the sale of sashimi grade tuna steaks in the United States.  (**Exhibit 1, Anova Web Site).**

7.   A key concern for the marketing, sale, and delivery for sashimi grade raw tuna is the preservation of the red color of fresh tuna.  The color of fresh meat is determined by hemoglobin in the blood and myoglobin in the muscle tissue. Myoglobin is made up a globular protein ring and a heme ring containing an iron ion.  The pigment of the meat is dependent on the oxidative state of the iron ion.  Myoglobin initially has a deep red, almost purple, color.  When cut and exposed to air, myoglobin reacts with oxygen to produce oxymyoglobin and the characteristic bright red color of fresh tuna.  The attractive bright red color of fresh tuna turns to brown as oxymyoglobin oxidizes into metmyoglobin.  This process occurs even when seafood is conventionally frozen at temperatures between 0 and $-30°$ F ($-18$ to $-34°$ C).  Unlike oxygen, carbon monoxide (CO) has a greater bonding affinity with the heme ring than oxygen and when tuna myoglobin is exposed to CO, carboxymyoglobin is formed.

8.   Carboxyglobin enables tuna to retain its initial red color when frozen for transport as sea freight and stored in

warehouses for regional distribution.  Product so treated can be stored frozen and thawed when needed.  Most freezer systems in the United States may store CO-treated fish safely for up to a year while preserving the color of the tuna.

9.    Although synthetic CO can be (and often is) used for color preservation in seafood, methods that employ natural filtered wood smoke, filtered to remove taste imparting components, are often favored, both by market preference and, in some circumstances, government regulation.  Synthetic CO, particularly at high concentrations, can in some cases be used to induce a more intense coloration "bloom" in lower-grade tuna. More intense color enables vendors to pass off to consumers lower grade tuna as what appears a higher-grade tuna.

10.  A market exists in the United States for fish processed with filtered wood smoke as opposed to synthetic CO, as some consumers prefer products with the label "filtered wood smoke" instead of "CO" or "carbon monoxide."

11.  The importance of "filtered wood smoke" is demonstrated by competing trademarks and patents for smoke processing for preservation of seafood.

## FEDERAL CLAIMS

12.  In public marketing materials, Anova claims that its tuna products are superior to its competitors' offerings by Anova's use of another patented process.  Anova purports to sell raw tuna processed according to the methods of U.S. Patent 6,777,012 ("'012 Patent") for SEAFOOD PRESERVATION PROCESS, granted on August 17, 2004, which describes a process involving

an application of filtered wood smoke and subsequent treatment with ozone to remove "smoke" taste. **(Exhibit 2, '012 Patent).**

13.  In public marketing materials, Anova claims that its tuna products are superior to its competitors' offerings by Anova's use of a "Clearsmoke" process.

14.  The Clearsmoke process purports to treat raw tuna with smoke "generated by using a standard commercial smoke generator that burns hickory wood chips." Anova further claims that the process "begins with Hickory Wood Chips from Wisconsin or Tennessee which are the highest food grade quality and fully traceable to FDA standards." Anova represents that the Clearsmoke process has "One ingredient only: Hickory Wood Chips." **(Exhibit 3, Anova Web Site).**

15.  Anova further states: "Since 2004, Anova Food is the proud owner of the patent number 6,777,012 which sets out how the Clearsmoke® process works. Granted by the U.S. patent office, a patented process is innovative and unique. And that's just what Clearsmoke® is, allowing the fish so treated to preserve color and taste, and reduce bacteria so extending shelf-life, all without the usual taste and smell of a smoke treatment." Anova claims that the use of hickory wood smoke provides advantages to consumers. Anova states, "Clearsmoke® is a preserving process for producing top quality fish. Fish treated in this way stays fresher longer and keeps its color better without any noticeable smoky taste. By taking the natural preservative qualities of hickory wood smoke and filtering out the unnecessary smoke flavor elements we retain all the advantages of the smoking process." Anova's marketing materials

equate the Clearsmoke process to the '012 Patent. **(Exhibit 3, Anova Web Site).**

16. On information and belief, Anova's marketing and advertisements are literally false as in actual practice Anova sells raw tuna products which are treated and processed in a manner substantially different from the representations in Anova's advertising and marketing communications.

17. On information and belief, Anova's marketing and advertisements are literally false as in actual practice Anova misrepresents the nature, characteristics and qualities of its tuna products by claiming that all raw tuna products are treated with filtered wood smoke to preserve color. On information and belief, Anova sells raw tuna products from its Philippine processing plant, operated by Kingford, treated with synthetic industrial CO, not filtered wood smoke. **(Exhibit 4, Declaration of Rosalinda M. Getis).**

18. On information and belief, Anova's marketing and advertisements are literally false as in actual practice, seafood treated with synthetic CO is improperly labeled, marketed and sold by Anova with the descriptions of "Clearsmoke" and "Filtered Wood Smoke."

19. Based on readily available public data, since 2001 Anova has imported approximately 42 shipments totaling 1,800,000 pounds of tuna from Philippine Kingford, a Philippine Corporation which was labeled, marketed and sold as treated with smoke and marketed as "Clearsmoke." **(Exhibit 5, Urner Barry Data.)**

20.   On information and belief, Anova's marketing and advertisements are literally false in that Anova misrepresents the nature, characteristics and qualities of its tuna products by representations that Clearsmoke™ branded product are considered GRAS (Generally Recognized as Safe) by the US FDA when no such determination has been made.

21.   On information and belief, Anova's marketing and advertisements are literally false in that Anova misrepresents the nature, characteristics and qualities of its tuna products by representations that Anova provides quality assurance of compliance with Clearsmoke™ processing. Anova states, "It has always been our second nature to ensure that the fish we sell reaches our customers in top condition. Not only does this give us an edge on most competition, it also means that we satisfy the demands of the regulatory bodies in advance of legislation. At the heart of this lie our Quality Assurance Program and our Quality Control Procedures." On information and belief the "Quality Assurance Program" and "Quality Control Procedures" marketed by Anova are either non-existent or willfully disregarded by Anova.  (**Exhibit 6, Anova Web Site.**)

22.   On information and belief, Anova's marketing and advertisements are literally false or likely to mislead customers in that Anova markets and promotes tuna as treated with gas with "low concentrations" of carbon monoxide when in fact the gas used to treat the tuna is not accurately described as having "low concentrations" of carbon monoxide.

23.   Anova further misrepresents the origin and nature of its tuna products by claiming that all raw tuna products are

treated according to the methods of the '012 Patent. On information and belief, Anova's processing with filtered wood smoke or CO not sourced from smoke does not comport with the methods identified in the '012 Patent, in that (1) processing uses synthetic CO rather than filtered wood smoke, and (2) processing does not involve the use of ozone.

24. Anova's misrepresentations were intended to deceive the public and inducing them to believe that Anova's tuna products were made, offered for sale, sold, or imported into the United States as protected by a patent and thereby constitute a violation of 35 U.S.C. § 292.

25. Anova has sold and continues to sell improperly labeled seafood, engaging in misrepresentation in commercial advertising, in violation of 15 U.S.C. §1125(a).

26. On information and belief, Anova's misrepresentation through improper labeling actually deceived or tended to deceive consumers.

27. On information and belief, Anova's misrepresentation through improper labeling was likely to influence purchasing decisions of consumers.

28. As a competing seller of tuna products in the United States, King Tuna was injured by Anova's misrepresentations as to the nature, source, and qualities of Anova's "Clearsmoke" seafood products.

29. As a competing seller of tuna products in the United States, King Tuna was injured by the direct diversion of sales from itself to Anova and by a loss of goodwill associated with King Tuna's products.

COMPLAINT

30. As a competing seller of tuna products in the United States, King Tuna has sustained expenses and losses as a result of Anova's misrepresentations as to the nature, characteristics, qualities, and origin of Anova's tuna products.

**STATE CLAIM**

**(CALIFORNIA BUSINESS & PROFESSIONS CODE §17200 et seq. §17500)**

31. Plaintiff maintains the above allegations.

32. Anova engages in unlawful business practices within the State of California, marketing and selling product to California consumers in violation of California law in one or more of the following ways:

    A. Anova's conduct is unlawful as to the source, approval, or certification of goods. (Cal. Bus. and Prof. Code Sec. 17200).

    B. Anova's misrepresentation as to the source, approval, or certification of goods is unfair – the harm caused by such conduct outweighs any benefit to Anova, the State of California or its residents. (Cal. Bus. and Prof. Code Sec. 17200).

    C. Anova's conduct is fraudulent as members of the public are likely to be deceived as to the source, approval, or certification of goods. (Cal. Bus. and Prof. Code Sec. 17200).

    D. Anova's representation as to the source, approval or certification of good is false and thus, constitutes unfair, deceptive, untrue and/or

misleading advertising. (Cal. Bus. and Prof. Code Sec. 17500).

33. As a consequence of Anova's conduct, Plaintiff is entitled to injunctive relief and restitution.

**REQUEST FOR RELIEF**

Plaintiff, King Tuna respectfully requests this Court to:

**FEDERAL CLAIMS**

    a.    Enjoin Anova from false and misleading representations regarding the its products;

    b.    Award King Tuna statutory damages pursuant to 35 U.S.C. § 292;

    c.    Award King Tuna statutory and compensatory damages of greater than $100,000.00, pursuant to 15 U.S.C. §1117;

    d.    Order the disgorgement of all Anova profits related to Anova's misconduct pursuant to 15 U.S.C. §1117(a)(1), estimated to be greater than $100,000.00;

    e.    Increased and treble damages for willful conduct pursuant to 15 U.S.C. §1117(b);

    f.    Award King Tuna attorney fees and costs pursuant to 15 U.S.C. §1117(a)(3); and

    g.    Award King Tuna any other relief appropriate under the circumstances.

**State Claims**

    a.    Enjoin Anova from false and misleading representations regarding the its products

COMPLAINT

pursuant to Cal. Bus. and Prof. Code Sec. 17200 et seq.;

    b.   Award King Tuna restitution in the amount of not less than $100,000.00 and any other proper penalties pursuant to Cal. Bus. and Prof. Code Sec. 17200 et seq.;

    c.   Award King Tuna any other relief appropriate under the circumstances.

Plaintiff King Tuna hereby DEMANDS A JURY TRIAL.

DATED: November 13, 2007       Respectfully submitted,
ROBINSON & PEARMAN LLP

By:  Robert C. Pearman, Jr., Esq.
Attorneys for PLAINTIFF KING
TUNA, INC.

-11-

COMPLAINT

**EXHIBIT 1**



Exhibit 1

**EXHIBIT 2**



US006777012B2

(12) **United States Patent**
     Olson et al.

(10) Patent No.:     **US 6,777,012 B2**
(45) Date of Patent:     **Aug. 17, 2004**

(54) **SEAFOOD PRESERVATION PROCESS**

(76) Inventors: **Blane E. Olson**, 715 Glen Forest Rd.,
     NE. Atlanta, GA (US) 30328; **Douglas
     B. Brinsmade**, 1245 Spalding Dr.,
     Atlanta, GA (US) 30350

( * ) Notice:     Subject to any disclaimer, the term of this
     patent is extended or adjusted under 35
     U.S.C. 154(b) by 488 days.

(21) Appl. No.: **09/874,885**

(22) Filed:     **Jun. 5, 2001**

(65)          **Prior Publication Data**

     US 2002/0054942 A1 May 9, 2002

          **Related U.S. Application Data**

(60) Provisional application No. 60/241,920, filed on Oct. 20,
     2000, now abandoned.

(51) Int. Cl.[7] .......................... **A23B 4/048**; A23B 4/06;
                                                   A23B 4/09

(52) U.S. Cl. ...................... **426/264**; 426/265; 426/262;
          426/263; 426/315; 426/320; 426/326; 426/332;
                                       426/393; 426/643; 426/316

(58) Field of Search ................................. 426/315, 263,
          426/264, 265, 316, 312, 314, 320, 332,
                                       262, 326, 393, 643

(56)           **References Cited**

          U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2,120,237 A | 6/1938 | Brenner et al. | |
| 3,859,450 A | 1/1975 | Alsina | 426/268 |
| 4,522,835 A | 6/1985 | Woodruff et al. | 426/264 |
| 4,552,766 A * | 11/1985 | Ducharme | 426/332 |
| 4,753,809 A * | 6/1988 | Webb | 426/315 |
| 5,368,872 A * | 11/1994 | Davis | 426/315 |
| 5,484,619 A * | 1/1996 | Yamaoka et al. | 426/315 |
| 5,540,942 A | 7/1996 | Tokoro | 426/265 |
| 5,783,242 A | 7/1998 | Teague | 426/320 |
| 5,972,401 A * | 10/1999 | Kowalski | 426/315 |

          FOREIGN PATENT DOCUMENTS

DE          3043489     * 11/1980

          OTHER PUBLICATIONS

Sb. Tr. Leningr. Tekhnol. In–t Kholodil 'n. Prom–sti; No. 3,
Kolodyaznaya, V. S. et al., "Effect of Ozone on Oxidative
Processes Occuring During Storage of Semi–Smoked Sau-
sage" Item 1. File 399, 1975.*
Annual Reports of the Food Research Institute Aichi Pre-
fecture No. 27, 39–50, Naito Preservation of Smoked Cuttle-
fish by 03 Treatment Item 2, File 51, 1986.*

* cited by examiner

*Primary Examiner*—Steve Weinstein
(74) *Attorney, Agent, or Firm*—Thomas, Kayden,
Horstemeyer & Risley

(57)          **ABSTRACT**

The preservation of meat products is accomplished utilizing
a combination of smoke, ozone and freezing preservation
techniques. Particularly, fish products are sized into portions
that are first treated with smoke, followed by treatment with
ozone and then optionally frozen. The preservation system
extends the shelf life of the fish products and permits the fish
to maintain its freshness and freedom from bacterial decom-
position for a longer period of time following catch. The
preservation process further maintains the characteristics of
day caught fish, such as taste, texture and color, making the
refreshed fish products produced by the present system more
appealing to consumers.

          **37 Claims, 5 Drawing Sheets**



Exhibit 2
Page 1 of 13



*Fig. 1*



*Fig. 2*



*Fig. 3*



*Fig. 4*

Exhibit 2
Page 2 of 13



*Fig. 5*

Exhibit 2
Page 3 of 13



**Fig. 6**

**Fig. 7**

Exhibit 2
Page 4 of 13



*Fig. 8*



*Fig. 9*

Exhibit 2
Page 5 of 13



**Fig. 10**

Exhibit 2
Page 6 of 13

US 6,777,012 B2

1

# SEAFOOD PRESERVATION PROCESS

## CROSS REFERENCE TO RELATED APPLICATION

This application claims priority to U.S. provisional application entitled, "Seafood Preservation Process," having Ser. No. 60/241,920, filed Oct. 20, 2000 now abandoned, which is entirely incorporated herein by reference.

## TECHNICAL FIELD

The present invention is generally related to the preservation of seafood and other food products for consumer consumption, and more particularly is related to a process for preserving fish by treating fish with smoke and ozone to retard degradation of the fish and maintain the fresh-like appearance of the fish. Optionally, the fish can then be frozen to further prolong its shelf life

## BACKGROUND OF THE INVENTION

The preservation of fish has been a major concern for fishermen and fish processors for centuries. Originally man salted and dried fish to preserve it. Since the advent of mechanical refrigeration, the fish have been preserved by freezing and refrigeration, thus permitting fishermen to make longer fishing trips, as well as transport the fish long distances over land or water.

The length of time over which fish maintains its freshness is commonly referred to as its shelf life. The shelf life of fish is determined by a number of factors, including the total number of each type of bacteria initially present, the specific types of bacteria present, the temperature of the flesh of the fish and of the surrounding atmosphere, and the pH of the fish. It is known that to extend the shelf life of fish, one may, for example, reduce the number of bacteria present using chemical means, freezing or other methods, create an acidic pH and/or reduce the product below 5° C. in its fresh state. The most common process employed to extend the shelf life of fish is freezing.

An inherent problem with freezing fish is its loss of the "fresh" attributes such as a "pink" or "red" meat color to both the fish flesh and the "blood line" in the fish. The loss of these attributes causes the value of the frozen fish to be much less than the value of fish that has not been previously frozen. This loss of value is an interpretation of the quality of the fish by the consumer. The color of the flesh and blood line of the fish is a major factor in the selling of seafood at the consumer level. Most consumers purchase fish with their "eyes" rather than with any other factor, such as smell, taste or texture. Therefore, it is desirable to maintain the "fresh" pink/red color of the seafood products as long as possible in order to sell the product at a premium to consumers.

Although many factors may effect changes to the color of fish products, the main reduction of color results from damage to the hemoglobin pigments in the fish. Several of the primary causes for the reduction of hemoglobin pigments, resulting in a corresponding reduction in the "fresh" color of the fish, include oxidation of the "red" hemoglobin pigments in the flesh to a "brown" color; bacterial decomposition of the cells containing the hemoglobin pigments; and destruction and oxidation of the hemoglobin pigment during freezing.

Most unfrozen fish is considered "fresh" for as many as 30 days from catching. However, unfrozen fish this old usually contains high levels of dangerous bacterial decomposition. Bacterial decomposition of fish is the cellular breakdown of

2

the flesh of the fish due to the digestive enzymes of bacteria present on or within the flesh of the fish. Conversely, frozen fish is usually frozen upon catching which reduces the likelihood that the fish will contain significant or harmful levels of bacterial decomposition.

In order to preserve the freshness of the fish and maintain the color of the flesh and blood line to a satisfactory consumer level, processes using smoking and freezing techniques have been applied.

Smoking of fish has been one of the major forms of fish preservation for centuries. Smoking involves the burning of organic substances, such as wood, to produce a complex mix of over 400 separate chemical compounds. These compounds, when continually exposed to fish flesh, are absorbed into the meat over time and impart a smoke flavor to the flesh. The smoke compounds act as a natural "bacteriostat" and greatly increase the refrigerated shelf life of the flesh (up to three times the un-smoked shelf life). Smoking of fish increases the shelf life by killing a majority of the bacteria initially present, and then creating an acidic environment that slows the growth of bacteria over time in refrigerated conditions. The compounds in the smoke that are primarily responsible for the extension of the shelf life of fish are the aldehydes and phenols, as well as $CO$, $CO_2$, $NO$, $NO_2$, which are the main gaseous components of smoke. These compounds maintain the "fresh" color of the fish, as well as prevent the growth of bacteria both on the surface of the fish and within the flesh.

However, one of the problems inherent in smoking fish products to impart preservation properties is that the smoke odor and/or smoke taste remains present in the fish flesh. Additionally, smoke that is produced from organic fuel materials typically contains particulates, such as creosote, tar, soot, etc., which are undesirable elements to have in contact with the fish product. Thus, it is beneficial to provide a smoke that has had some of the particulate removed and further remove the smoke odor/taste while still maintaining the extended shelf life.

U.S. Pat. No. 5,972,401 to Kowalski discloses a process for manufacturing a tasteless, super-purified smoke for the treatment of seafood and meat. The super-purified smoke is then applied to seafood or meat to preserve the freshness, color, texture, and natural flavor, particularly after the seafood or meat is frozen and thawed. Kowalski teaches that the smoke must be super-purified by filtering out a substantial amount of odor and taste imparting particulate matter and gaseous vapors, thereby recovering the smoke in a tasteless form. Thus, Kowalski is limited in that it requires that the smoke be super-purified into a tasteless form in order to prevent the impartation of the smoke odor or taste to the seafood or meat products.

U.S. Pat. No. 5,484,619 to Yamaoka discloses a process for smoking fish and meat at low temperatures, thereby conferring a smoked flavor and taste, and further preventing decomposition and discoloration of the fish or meat. As in Kowalski, the smoke is filtered to remove the larger particulates and provide a smoke that will preserve, sterilize and aid in maintaining the color of the flesh of the fish or meat. However, Yamaoka teaches that the smoke odor or taste will remain in the fish or meat and that the temperature of application of the smoke is important. Specifically, the Yamaoka smoke preservation process must be carried out at extremely low temperatures (between 0 and 5° C.) in order to maintain the freshness and quality of the fish or meat products Therefore, Yamaoka is limited to a smoke process for preserving fish or meat products wherein the product will

Exhibit 2
Page 7 of 13

US 6,777,012 B2

3

retain a smoke odor or taste, and the process is further limited to a narrow range of temperature conditions.

U.S. Pat. No. 2,120,237 to Brenner et al. discloses a method for partially drying and then smoking fish fillets to preserve them. The fish fillets were first dried to remove a substantial portion of the moisture present and then treated within a smoke atmosphere. This method imparted a smoke flavor to the dried fillets and aided in the prevention of the fish deterioration.

It is also known to preserve the freshness or color of fish or other meat products by several other methods of treatment. U.S. Pat. No. 3,859,450 to Alsina teaches that melanosis (blackening) in shellfish is prevented by application of an innocuous acid solution followed by carbon dioxide gas. The resultant chemical reaction between the acid solution and the carbon dioxide produces carbonic anhydride that penetrates the shellfish and prevents melanosis during preservation by freezing. The process also discloses that the use of a food preservative, such as metabisulphite, will prolong the preservation of the original taste and texture of the shellfish after thawing.

U.S. Pat. No. 4,522,835 to Woodruff et al. discloses a process for maintaining good color in meat, poultry and fish products. Specifically, Woodruff teaches that subjecting the product to an atmosphere containing a low oxygen concentration and followed by an atmosphere containing a small amount of carbon monoxide will convert oxymyoglobin to carboxymyoglobin. The process produces a red color in the product and permits lengthy refrigeration of the product (two to three weeks). Further preservation is accomplished by Woodruff by maintaining the product in a modified carbon dioxide atmosphere or by freezing.

U.S. Pat. No. 5,540,942 to Tokoro teaches that the freshness of meat or fish may be improved by treatment with ubidecarenone to prevent discoloration of the product. The ubidecarenone additive prevents the oxidation of the haem pigments, thereby maintaining the red color of "fresh" product by preventing discoloration to a brown or gray appearance.

Ozone, a GRAS (generally regarded as safe) substance, has been used for more than ten years to sanitize, deodorize and prevent bacterial growth in food items. Its main strength is in the killing of surface and subsurface bacteria that lead to decomposition of fish flesh during refrigerated storage. Ozone may be applied using a gaseous or liquid medium or a combination thereof.

U.S. Pat. No. 5,783,242 to Teague discloses a process of treating poultry with ozone and ozone dissolved in water to reduce the population of contaminating organisms. The product is first subjected to a solution containing ozone and then exposed to a gaseous atmosphere containing ozone. The product is also subjected intermittently to UV exposure which further acts as a bactericide and decomposes any ozone remaining on the product into oxygen.

Although, it is known that the foregoing techniques may be used to preserve the fish flesh itself, these techniques often result in an appearance of fish that has lost its "fresh" attributes. Accordingly, without the 'pink' or 'red' color of the fish flesh, consumers often consider such preserved fish as "not fresh," resulting in a lower sales price for the fish. The foregoing techniques claim to maintain the color of the fish do so with the addition of chemical additives and preservatives which can alter the taste and texture of the fish or be toxic in certain dosages to humans. Additionally, maintaining the "fresh" attributes of the fish is not taught when the fish is preserved or further preserved by freezing.

4

Therefore, a heretofore unaddressed need exists in the industry to satisfy the aforementioned deficiencies and inadequacies and provide a preserved fish that retains all of the qualities and characteristics of a "day caught" fish.

## SUMMARY OF THE INVENTION

Through research and product development, the inventors have devised a process for fish preservation that results in the production of an extremely high quality, fresh seafood product line with extended shelf life characteristics. The fish products are preserved using smoke and ozone so as to maintain the qualities and characteristics of freshly caught fish.

The process allows the transportation of fresh and frozen seafood items from remote areas of the world in a safe, sanitary and economical way. However, Applicants' preservation process has overcome the drawbacks of typical freezing techniques and allows the consumer to receive a high quality, extremely safe fish with the taste, texture and attributes of freshly caught fish. The fish appears "fresh" to consumers as it retains its red, or bright, color and is, thus, more appealing.

In general, the process includes the steps of smoking of fresh fish, treating it with ozone and optionally freezing the fish. When a smoke and ozone process is utilized, the shelf life is extended and the fish retains more of its "fresh" color. The smoke/ozone process retains the "fresh" color and extends shelf life of the fish flesh by binding the carbon monoxide molecule to the heam pigment in the hemoglobin molecule in such a way that it takes much greater than normal oxidative force to oxidize the hemoglobin molecule. Furthermore, the smoke/ozone process aids in the prevention of bacterial decomposition and maintains the hemoglobin molecule (red color) during freezing and frozen storage by binding it with a CO molecule.

Optionally, the smoke/ozone process can include the steps of wiping the flesh of the fish with alcohol one to three times during the preservation process, before or after smoking the fish. The application of alcohol to the exterior of the fish kills surface and shallow bacteria on contact with the alcohol. The fish would be placed in a modified "smoke" atmosphere for 1 to 72 hours, with the length of time depending on the thickness of the fish product, with thicker products requiring more time than thinner products. If the smoke is applied to the fish while in a vacuum chamber, the time required for the smoke application can be reduced to less than a minute. During the smoking step, a vast majority of "aerobic" bacteria die as there is no oxygen available for them to breathe. The smoking step additionally creates an acidic pH in the fish by the dissolution of free carbon dioxide, present in the smoke, into the fish. The acidic pH prevents the growth of bacteria during the "fresh" stages of the process. An optional final step can involve freezing the product to kill an additional percentage of the bacteria present on the product The fish product can be initially prepared into appropriately sized sections or fillets in order to accelerate the smoke/ozone application steps.

With the use of this fish preservation process, the shelf life of the product is increased, usually from about 2–3 days after the product is landed to about 10–12 days. This increase in shelf life after the product has been treated allows the product to be shipped to remote areas requiring longer shipping times. Also, the final processing of the product into consumer-ready forms, including cutting, portioning and packing the product, can be performed at the central processing facility. This avoids the necessity of having to perform the final processing of the product at the store level.

Exhibit 2
Page 8 of 13

US 6,777,012 B2

5

Other processes, systems, methods, features and advantages of the present invention will be or will become apparent to one with skill in the art upon examination of the following drawings and detailed description. It is intended that all such additional processes, systems, methods, features and advantages be included within this description, be within the scope of the present invention, and be protected by the accompanying claims.

## BRIEF DESCRIPTION OF THE DRAWINGS

The invention can be better understood with reference to the following drawings. The components in the drawings are not necessarily to scale, emphasis instead being placed upon clearly illustrating the principles of the present invention. Moreover, in the drawings, like reference numerals designate corresponding parts throughout the several views.

FIG. 1 is a cross sectional view of an open top liquid container with a basket of fish products immersed in a brine.

FIGS. 2–4 are schematic elevational views of a vacuum bag and the fish products contained therein, showing the bag in its relaxed, vacuum and inflated configurations, respectively.

FIG. 5 is a schematic view of the smoke machine.

FIG. 6 is a side elevational view of the centrifuge used in the smoke machine.

FIG. 7 is a cross section of the centrifuge, taken along lines 7—7 of FIG. 6.

FIG. 8 is a side view of the bag filling device

FIG. 9 is a perspective view of the ozone dipping tank and basket.

FIG. 10 is a plan view of the ozone chamber used for fish steaks.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

The inventors have devised a process for preserving seafood products and other meat products of various types. Typically, the first step of the process involves the initial preparation of the fish product into appropriately sized sections 101. The skin and bones may either be removed or may be left on. As shown in FIG. 6, if the fish is of the pelagic species, such as salmon or tuna, the fish can be cut into loin portions or steaks 102. If any loin portion has a thickness that is too big for expedient smoke and/or ozone treatment, the loins can be cut into steaks.

As shown in FIG. 1, the sized fish product 101 is placed in a single layer in a basket 105 or porous tray, preferably plastic, and the basket with the fish is immersed into an aqueous solution 104 of salt and baking soda in a container 103. The container 103 for the aqueous solution should have sufficient dimensions such that the fish products 101 are maintained in a single layer and are completely immersed in the aqueous solution 104. The aqueous solution 104 preferably is a thoroughly mixed solution in a ratio of approximately ten liters of cold water at approximately 2 to 5° C., 200 grams of salt and 100 grams of baking soda.

The fish product 101 in the basket 105 is completely immersed in the aqueous solution 104 for approximately twenty seconds, after which time it is removed with the basket from the container 103 and the excess aqueous solution 104 is allowed to drain away from the fish. The fish product 101 usually is then patted dry using a porous plastic sponge, or the like, (not shown in the drawings) that has been previously sanitized in alcohol.

6

As shown in FIG. 2, the dry fish products 101 are then inserted into a vacuum bag 106 or another type of container in a single layer of the products. It is acceptable for the products to come in contact with each other. As shown in FIG. 3, the vacuum bag 106 or other type of vacuum container is vacuum sealed about the products using a conventional vacuum packaging machine (not shown). The vacuum seal formed about the products should be tight enough to remove substantially all of the air from the container 106, but not so tight as to damage or flatten the fish product.

Once the air has been removed from the sealed container 106, the container is filled with filtered smoke 107 as shown in FIG. 4. The container 103 should be filled with smoke until there is a slight pressure on the container. The container should remain sealed, such as with heat sealing of the layers of a plastic bag together, to prevent any of the smoke from exiting the bag 106.

The smoke can be generated by a smoke machine 110, as shown in FIG. 5. The smoke machine 110 includes a smoke generator 111, a smoke cooler 112, a centrifugal precipitator or centrifuge 114, motor 115, a centrifuge fan 116 and connecting belt and sheaves 118. Motor 115 rotates centrifuge fan through the belt and sheaves in a conventional arrangement. Dirty smoke draw chamber 120 and its suction fan 121 draw the dense or dirty smoke from the centrifuge through mid height exhaust conduit 122, and push the smoke through a filter 124 to the atmosphere. Some of the heavier precipitates of the smoke will move down the converging interior wall 125 of the centrifuge housing 126 through the open bottom to a water trap 128.

The clean smoke is gathered at the vertical axis of the converging conical interior wall of the centrifuge by the inlet opening 129 of the clean smoke exhaust conduit 130. The clean smoke exhaust conduit leads to clean smoke exhaust compressor 131, through filters 132 to smoke storage tank 134.

It would be apparent to one skilled in the art to modify the aforementioned embodiment of the smoke machine 110 by the addition or deletion of certain devices without substantially altering the purpose of supplying a filtered smoke. The smoke generator 111 is of conventional construction and is adapted for the burning of wood or other organic material for the generation of smoke. The smoke is passed from the smoke generator 111 through the smoke cooling conduits 113 of the smoke cooler 112. Cold water is circulated about the smoke cooling conduits to chill the smoke from about 900 degrees F. as it exits the smoke machine to about 400 degrees F. before moving into the centrifuge.

After the smoke has been generated by the smoke generator 111 and passed through the smoke cooler 112, it is passed through the centrifuge 114. The centrifuge 114 removes the majority of the particulate phase, i.e. any particle larger than approximately one micron, of the smoke. The particulate phase, which contains mainly ash and tar, is removed by running the product through the centrifuge 114 (see FIGS. 5 and 6 showing typical centrifuge design and implementation). The centrifuge 114 creates a cyclone effect inside the main chamber 117 by spinning a "squirrel cage" fan blade 116 at a speed of approximately between 3500 and 4000 rpm. The spinning action causes the heavy particulates of the smoke, mainly tar, to be flung by centrifugal force against the inside surface of the perimeter wall 125 of the chamber 126 at high velocity. The heavy particulates then move down the inside wall and funnel down to a collecting receptacle or water trap 128 at the bottom of the conical

Exhibit 2
Page 9 of 13

US 6,777,012 B2

7

chamber **126**. The collecting receptacle **128** is partially filled with water at the lower open end of the centrifuge **114** so as to trap the heavy smoke particulates being exhausted by the precipitator. With the heavy particulate phase removed, the lighter, cleaner smoke at the center of the vertical axis **119** of the centrifuge **114** enters the outflow pipe and is directed into the smoke storage tank **134**.

Excess uncleaned smoke is directed through mid height exhaust conduit **122** and through exhaust suction fan **121**. Fan **121** is a variable speed fan that regulates the amount of smoke drawn through the system.

The clean smoke is dispensed on demand from the centrifuge **114** by the compressor **131**. The resulting clean smoke exits the centrifuge **114** with a very clear appearance. It is directed by the compressor **131** and its connection hoses through a final filtering device **132** and is collected and maintained in a smoke storage tank **134**. When a smoke storage tank is filled with smoke it is refrigerated and stored for later use.

As illustrated in FIG. **8**, the cooled cleaned smoke is later inserted into the vacuum bag **106** with the fish product **101** by placing the hollow needle **140** of an air chuck **141**, which is connected to the smoke storage tank **134** via clean smoke dispensing conduit **142**, into the bag **106** and pulling the trigger mechanism **144**. This opens a valve and allows the clean smoke to move into the vacuum bag **106**. For high volume production, the bag **106** can be filled by using a modified atmosphere packaging system like the CVPAT600. If another type of vacuum chamber is used, not a bag, the smoke can be dispensed into the chamber by using a valve controlled conduit.

The filtered smoke will have an initial level of $CO/CO_2$ in the vacuum chamber and the $CO/CO_2$ level should be periodically measured. When the $CO/CO_2$ level begins to decline appreciably, the vacuum chamber is voided of and refilled with smoke until the color characteristics of the fish have stabilized. This procedure should preferably occur at a temperature range of 0 degrees C. to 5 degrees C. and can take anywhere from 1 minute to 72 hours depending on the type of fish product and the characteristics of the smoke and the method of applying the smoke. After this, the smoked fish product is placed in an ozonated environment at a temperature range of about 0 degrees C. to 5 degrees C. and is maintained in the ozonated environment until the odor of smoke is no longer detectable. Depending on the type of fish product and the amount of smoke odor that the product has absorbed during the smoking step, it may take anywhere from 1 minute to 72 hours depending on the type of fish product, the characteristics of the smoke, and the method of applying smoke, for the smoke odor to be sufficiently diminished that it is no longer detectable. The fish product is then removed, vacuum sealed and can be optionally frozen using conventional freezing techniques. When it is desired to use or display the fish product, the fish product is defrosted. The present process for preserving the fish product results in a refreshed fish product that closely parallels a day caught fish in quality, characteristics and appearance.

When the decline of the $CO/CO_2$ level slows appreciably during the smoke application process, the remaining smoke should be removed from the vacuum chamber **106** and replaced with another charge of smoke, as might be necessary. The smoking step should be repeated until the color characteristics of the fish product **101** have stabilized. Depending on the type of fish product **101**, the temperature and the smoke characteristics, it may take between approximately twelve to seventy-two hours at atmospheric pressure

8

to satisfactorily complete the smoking step. However, if the smoke is applied in a vacuum chamber at a reduced pressure to the product, the smoke application step can be performed in minutes.

Once the smoking step is complete, the fish product **101** is removed from the vacuum chamber **106** and may be patted dry using a porous plastic sponge, or the like, sanitized with alcohol. The product is checked for smoke odor. As shown in FIG. **9**, the fish product **101** is then placed in a basket **150** or other porous tray device. The fish product **101** may be situated within the basket **150** in either a single or double layer configuration. The basket **150** is then immersed into an ozone dipping tank **151**, that contains chilled (at about 5° C.) ozonated water **152** (approximately 2 ppm ozone) for between approximately one minute and one hour. The product can be left in the ozonated water for more than one hour, if desired.

The odor of the fish product **101** is periodically monitored by removing the basket **150** from the ozonated water **152** and sniffing to detect a smoke odor. At the point that the smoke odor is no longer noted, the fish product **101** should be removed from the ozonated water **152** and any excess ozonated water **152** should be allowed to drain away from the basket **150**.

The fish product **101** is then placed in a vacuum bag and vacuum sealed. The fish product **101** can be left unfrozen or can be frozen for even longer shelf life, using conventional freezing techniques. If frozen, the fish product **101** should be stored and maintained at temperatures below −18° C.

When the use of the frozen fish product **101** is desired, the product is defrosted while in the bag by either placing the bag in a cooler between 2 and 5° C. or by placing the bag in a basin of cold water. The refreshed fish product **101** will substantially retain the quality and characteristics of a freshly caught fish and may then be displayed or maintained at refrigerated temperatures for up to six more days.

If the fish product **101** is tuna, or other pelagic species, the ozone step is applied using a different technique. As shown in FIG. **10**, instead of using the ozone dipping tank **151**, pelagic fish steaks **102** can be ozonated in an ozone chamber **160** for better results. FIG. **6** illustrates an ozone chamber **160** design comprising an ozone generator **161**, intake **162**, deflector **164**, chamber **165**, exhaust **166** and product holding rack **168**. After the fish steaks **102** have been smoked and optionally wiped with an alcohol soaked sponge, the fish steaks **102** are placed on racks **168** in the ozone chamber **165**. The fish steaks **102** should remain in the ozone chamber **165** for approximately one minute to four hours or until they reach the desired level of smoke odor. Once the fish steaks **102** have been ozonated, they can be placed in a vacuum bag and vacuum sealed. For freezing they are placed in a vacuum bag and are vacuum sealed. For fresh fish, the fish are placed in distribution-ready packages.

As with the fish product **101**, when the frozen fish steaks **102** are to be used, the bag is defrosted by either placing the bag in a cooler between 2 and 5° C. or by placing the bag in a basin of cold water. The refreshed fish steaks **102** will retain qualities and characteristics of a fresh caught fish and may then be displayed or maintained at refrigerated temperatures for up to six more days.

Although the aforementioned embodiments are directed to fish products, it is anticipated by the inventors that the claimed preservation process may be applied with equally satisfactory results for fish, beef, pork, poultry and crustaceans. Additionally, the methods for applying the smoke and ozone, and for freezing may be varied from those specifically disclosed herein.

Exhibit 2
Page 10 of 13

US 6,777,012 B2

9

Particularly, it is anticipated by the inventors that the smoke may be applied under atmospheric, vacuum or pressured conditions and in any suitable containment vehicle, including heated or refrigerated conditions. The smoke itself may be comprised of any smoke suitable for treatment of food products for human consumption; may be generated by any number of means including, but not limited to, combustion, transformation between solid or liquid state to gaseous state, friction, pyrolysis, aerobically, anarobically, electrical heating or direct flame; and may be used in its whole or filtered state. If the smoke is filtered to remove any component of the smoke, such filtering may be performed by any physical means, carbon filtering, ice column filtering, centrifugal force, electrostatic force, or other known means of separating out a component of smoke. The smoke may be applied to the products in an open, batch, closed or flow-through system.

Likewise, the ozone treatments disclosed above in the preferred embodiments are not exclusive. The inventors anticipate that the ozone may be applied using any type of carrier medium including, but not limited to, air, gases, water, fluids or solids and under atmospheric, vacuum or pressured environments and in any suitable containment vehicle, including heated or refrigerated conditions. The ozone that is applied is not limited to "pure" ozone, but may be in reaction form, mixtures, solutions or other form. The ozone may be applied to the products in an open, batch, closed or flow-through system.

The freezing step of the preservation process may be accomplished using any number of conventional freezing applications. Particularly, it is anticipated by the Applicants that suitable freezing can occur under atmospheric, vacuum and pressured conditions in gaseous, liquid or solid freezing mediums or combinations thereof.

While the process described herein involves the treatment of fresh fish, a similar process can be applied to frozen fish. One such process is to thaw the frozen fish and later apply the smoke and ozone to the fish. A preferred process of treating frozen fish is to simultaneously thaw and smoke the fish in a chamber. This can be done in a vacuum chamber. This eliminates the exposure of the fish to standard atmosphere as it thaws.

It should be emphasized that the above-described embodiments of the present invention, particularly, any "preferred" implementations, are merely possible examples of implementations, merely set forth for a clear understanding of the principles of the invention. Variations and modifications may be made to the above-described embodiments of the invention without departing from the spirit and principles of the invention. All such modifications and variations are intended to be included herein within the scope of this disclosure and the present invention and protected by the following claims.

Therefore, having thus described the invention, at least the following is claimed:

1. A process for treating raw fish products for increasing the shelf life of the fish products and preserving the color and freshness of the fish products after the fish products have been frozen and thawed, comprising the steps of:

    subjecting the raw fish products to smoke to apply smoke to the fish products for a period sufficient to preserve and substantially maintain the color of the flesh and blood line of the fish products;

    a removing the smoke from about the smoked raw fish products;

    subjecting the smoked raw fish products to ozone to apply ozone to the smoked fish products for a period sufficient

10

    for the ozone to substantially remove smoke odor from the fish products and sufficient to reduce the existing bacteria on the fish products; and

    after the steps of applying smoke and ozone to the raw fish products freezing the raw fish products for storage and shipment,

    so that the combination of the smoking and ozone applications is sufficient such that when the smoked and ozone treated raw fish products are thawed, the color of the fish products is substantially maintained and the shelf life of the thawed fish is extended compared to fish that have been similarly treat with smoke, frozen and thawed without the ozone application.

2. The process of claim 1, further including the step of before the fish products are subjected to smoke and ozone cutting the fish products into portions that are of a size that the smoke applied to the fish products will permeate into and substantially through the fish products.

3. The process of claim 1, wherein the step of subjecting the fish products to smoke comprises subjecting the fish products to smoke for a sufficient period of time such that the smoke permeates the fish products and serves as a preservative of the fish products.

4. The process of claim 1, and further including the additional step of freezing the fish products before the fish products are subjected to smoke and ozone, and wherein the step of subjecting the fish products to smoke comprises simultaneously thawing the fish products and applying smoke to the fish products.

5. The process of claim 1, wherein the step of subjecting the fish products to smoke comprises cleaning the smoke by removing a portion of the particulate in the smoke prior to applying the smoke to the fish products.

6. The process of claim 1, wherein the step of subjecting the fish products to smoke comprises placing the fish products in a container, reducing the pressure in the container to a pressure less than atmospheric pressure, and introducing smoke into the container when the pressure in the container is less than atmospheric pressure.

7. The process of claim 6, and further including the step of, before the step of subjecting the fish products to smoke, cleaning the smoke by removing a portion of the particulate in the smoke before the fish products are subjected to the smoke.

8. The process of claim 1, wherein the step of subjecting the fish products to smoke comprises burning organic matter to form smoke, cleaning the smoke, chilling the smoke, and subjecting the fish products to the chilled and cleaned smoke at a pressure other than atmospheric pressure.

9. The process of claim 1, wherein the step of subjecting the smoked fish products to ozone comprises subjecting the fish products to ozone through a carrier medium.

10. The process of claim 9, wherein the ozone is applied to the flab products in a containment chamber.

11. The process of claim 1, wherein each of the steps of subjecting the fish products to smoke and ozone comprises reducing the atmosphere about the fish products to a pressure less than atmospheric pressure and introducing the smoke and ozone to the fish products in the reduced pressure atmosphere.

12. A process for treating raw fish for increasing the shelf life of the raw fish and preserving the color and freshness of the raw fish after the raw fish have been treated, frozen and thawed, comprising:

    a) forming raw fish into fish products of a predetermined size;

    b) placing the fish products into a chamber;

Exhibit 2
Page 11 of 13

11

c) withdrawing air from about the fish products in the chamber;

d) generating smoke from an organic substance;

e) removing the heavier particles from the smoke to create cleaned smoke;

f) introducing the cleaned smoke into the chamber and applying the cleaned to smoke to the fish products in the chamber;

g) containing the cleaned smoke within the chamber with the fish products for a predetermined period sufficient for the smoke to permeate into and substantially through the raw fish products, and to substantially maintain the color of the fish products;

h) withdrawing the cleaned smoke from the chamber while the fish products remain in the chamber;

i) introducing ozone into the chamber and applying the ozone to the smoked fish products in the chamber;

j) containing the ozone within the chamber with the fish products for a period sufficient to reduce the existing bacteria on the fish products and to substantially remove the aroma and taste of smoke from the fish products;

k) withdrawing the ozone from the chamber; and

l) freezing the smoked, ozone treated raw fish products,

so that the combination of smoking and ozone treatments of the raw fish products is sufficient such that when fish products are thawed, the thawed fish products have substantially retained their color from the time prior to having been smoked and the shelf life of the thawed fish products is extended compared to other similarly smoked, frozen and thawed fish without the ozone application.

**13**. The process of claim **12**, and further including repeating steps f and h before performing step i.

**14**. The process of claim **13**, and further including the step of repeating steps i, j, and k.

**15**. The process of claim **12**, wherein the step of withdrawing air from about the fish products in the chamber comprises forming a pressure less than atmospheric pressure in the chamber.

**16**. The process of claim **12**, wherein the step of containing the cleaned smoke within the chamber comprises placing the fish products in a vacuum bag.

**17**. The process of claim **12**, wherein the step of containing the cleaned smoke within the chamber comprises containing the cleaned smoke within the chamber and about the fish products for a sufficient time to apply enough cleaned smoke to the fish products so that the cleaned smoke on the fish products deters deterioration of the fish products.

**18**. The process of claim **17**, further including the step of monitoring the $CO/CO_2$ levels of the cleaned smoke residing within the chamber, and wherein the step of containing the cleaned smoke within the chamber with the fish products comprises containing the cleaned smoke in the chamber until an appreciable decline is noted in the $CO/CO_2$ levels.

**19**. The process of claim **17**, wherein the steps of introducing cleaned smoke into the chamber and containing the cleaned smoke in the chamber and about the fish products comprises removing the cleaned smoke from the chamber and introducing more cleaned smoke into the chamber and about the fish products until the color characteristics of the fish products in the chamber have stabilized.

**20**. The process of claim **12**, wherein the step of introducing the ozone into the chamber comprises introducing the ozone into the chamber as a liquid solution containing ozone.

12

**21**. The process of claim **12**, wherein the step of introducing the ozone into the chamber comprises introducing the ozone into the chamber as a gas or gaseous mixture containing ozone.

**22**. The process of claim **12**, wherein the steps of introducing and containing the ozone in the chamber comprises containing the ozone within the chamber and about the fish products for a sufficient time to apply enough ozone to the fish products so that odor and taste of smoke in the fish products are no longer detectable.

**23**. The process of claim **12**, wherein the step of freezing the fish products comprises freezing the fish products after the steps of ozonation and removal of the fish products from the chamber.

**24**. The process of claim **12**, wherein the step of freezing the fish products comprises freezing the fish products after the steps of smoking, ozonation and removal of the fish products from the chamber.

**25**. The process of claim **12**, further including the additional step of freezing the fish products before the steps of placing the fish products into the chamber and prior to the steps of smoking and ozonating the fish products.

**26**. A process of treating raw fish products for increasing the shelf life of the fish products and preserving the color and freshness of the fish products at a time alter the fish products have been frozen and thawed, comprising

the application of smoke to the raw fish products for a period sufficient to preserve and substantially maintain the color of the raw fish products, followed by the application of ozone to the fish products for a period sufficient to substantially remove the aroma and taste of smoke from the fish products and to reduce the existing bacteria on the fish products,

freezing of the raw, smoked and ozone treated fish products,

maintaining the frozen fish products in a frozen state until use is desired, and

thawing the fish products,

so that the combination of smoking, ozone treatment and freezing of the raw fish products is sufficient such that when the fish products are thawed, the thawed fish products have substantially retained their appearance from the time prior to having been smoked and the shelf life of the thawed fish products is extended compared to other similarly smoked, frozen and thawed fish products without the ozone treatment.

**27**. A process for preserving fish products as in claim **26**, wherein the applications of smoke and ozone preserve the fish products by substantially preventing or inhibiting the growth of bacteria on the surface of and in the flesh of the fish products.

**28**. A process for preserving fish products as in claim **27**, further comprising the additional step of freezing the fish products before the application of smoke and ozone.

**29**. A process for treating raw fish products for preserving the color and freshness of the fish products and for increasing the shelf life of said fish products after the fish products have been frozen and thawed, comprising:

(a) placing a raw fish product in a vacuum bag;

(b) subjecting the fish product to smoke in the vacuum bag until the exposure of the fish product to the smoke substantially stabilizes the color characteristics of the fish product;

(c) removing the smoke from about the fish product;

(d) treating the raw fish product wit ozone for a period sufficient to substantially remove the aroma and taste of

Exhibit 2
Page 12 of 13

US 6,777,012 B2

13

smoke from the fish products and sufficient to reduce the existing bacteria on the fish product; and

(e) freezing the raw, smoked and ozone treated fish product for storage and shipment,

so that the combination of smoking and ozone treatment of the raw fish product is

sufficient such tat when the fish product is frozen and later thawed the fish thawed fish product substantially retains its appearance from prior to having been smoked and the shelf life of the thawed fish product is increased compared to other fish that were similarly smoked, frozen and thawed without ozone treatment.

**30**. The process of claim **29** and further comprising the step of monitoring the decline of CO/CO2 levels in the smoke in the vacuum bag until the decline slows, at which point removing any remaining smoke from the vacuum bag.

**31**. The process of claim **30** and further comprising the steps of continuing to subject the fish products to smoke and removing the smoke from around the fish products.

**32**. The process of claim **29** wherein the fish products comprise laterally compressed fish products, the step of treating the fish products with ozone is performed by immersion of the fish products in an ozone dipping tank for a sufficient period of time to remove any detectable smoke odor or taste from the fish products.

**33**. The process of claim **29**, wherein the fish products comprise pelagic fish products, the step of treating the fish products with ozone is performed by immersion of the fish products in an ozone chamber for a sufficient period of time to remove any detectable smoke odor or taste from the fish products.

**34**. The process of claim **29**, wherein the fish products comprise laterally compressed fish products, the fish products are frozen at a temperature below −35° C., stored at a temperature below −18° C. and maintained at a refrigeration temperature between approximately 2 and 5° C.

**35**. The process of claim **29**, wherein the fish products comprise pelagic fish products, the fish products are frozen at a temperature below −40° C., stored at a temperature below −18° C. and are thawed and maintained at a refrigeration temperature between approximately 2 and 5° C.

14

**36**. A process of treating raw fish products for increasing the shelf life of the fish products and preserving the color of the fish products after the fish products have been frozen and thawed, comprising the steps of:

applying smoke to a raw fish product for a period sufficient to preserve the fish product and sufficient to substantially maintain the color of the blood line of the fish product;

after the smoke has been applied to the fish product, applying ozone to the smoked raw fish product for a period sufficient to substantially remove the aroma and flavor of smoke from the fish product and sufficient reduce the existing bacteria on the fish product; and

freezing the raw, smoked and ozone treated fish product for storage and shipment,

so that the combination of smoking, ozone treatment and freezing of the raw fish

product is sufficient such that when the frozen fish product is thawed the fish product substantially retains its appearance from prior to having been smoked and the shelf life of the thawed fish product is increased compared to other fish that were similarly smoked, frozen and thawed without the application of ozone to the fish.

**37**. A process of preserving the color and freshness of previously smoked raw fish and increasing the shelf life of the smoked raw fish after the fish has been frozen and thawed comprising:

treating previously smoked raw fish with ozone for a time sufficient to substantially remove the smoke aroma and flavor from the fish and sufficient to reduce the existing bacteria on the fish , and

freezing the smoked, ozone treated raw fish,

so that when the frozen fish is thawed the fish substantially retains its appearance from prior to having been smoked and the shelf life of the thawed fish is increased compared to other fish that were similarly smoked, frozen and thawed without the ozone treatment.

* * * * *

Exhibit 2
Page 13 of 13

**EXHIBIT 3**



Exhibit 3
Page 1 of 5



## One ingredient only:
Hickory Wood Chips



## One End result:



## Features

■ **Fresh Appearance**
Clearsmoke products retain the color and freshness characteristics of fresh product through the freezing and defrosting program.

■ **Shelf Life**
Clearsmoke products upon defrosting have an 8 day shelf life in the fresh seafood case. (Shrinkage is reduced on tuna from 35% to 3% for the retailer.)

■ **Fresh Taste**
The Clearsmoke process maintains fresh taste and texture of fish after it has been frozen and subsequently defrosted. It does this by preventing oxidation during the frozen storage as well as removing free water which would normally cause cell destruction during freezing resulting in 'mushy' flesh texture.

■ **Food Safety**
By eliminating the fresh distribution chain of airfreight and fresh trucking, you greatly reduce the chance of histamine production and other potentially dangerous bacterial issues during transit.

■ **Profit**
You offer a product that is comparable to fresh product but at a similar or at a slightly lower price. At the same time you receive much more money for frozen product than you would normally receive.

■ **Risk**
You eliminate the risk of product sitting on runways and spoiling.

■ **Planning**
You make a best friend out of retail accounts by being able to plan adds and actually deliver the product on time and at the agreed price.



## Clearsmoke® a Quick: 'How and Why'

Clearsmoke® is the resultant smoke that is produced by the Clearsmoke Smoke Generation System. (See below). Clearsmoke is utilized as a wood smoke by the same traditional methods used for all conventional wood smoking methods.

The key difference and importance of Clearsmoke is the intact state of the 'Preservation Gasses' that are produced by burning wood and the removal of particulate, ash and tar from the smoke stream. These Preservation Gasses are responsible for the extended shelf life and natural color of smoked products.

The Preservation Gasses in Clearsmoke, lock in the existing inherent color and freshness characteristics of the product at the point the smoke is applied. But it does not increase adulterate the color or quality of the product in any way.

A major component of the gasses is Carbon Dioxide ($CO_2$). $CO_2$ also is one of the main components extensively used in the food industry for extended shelf life in MAP and smoked food products. Carbon dioxide dissolves into the meat during the smoking phase and creates an acidic environment on the meat surface which in turn causes bacteria to grow slowly and therefore extend product shelf life.

The secondary filtration removes the 'particulate phenols' which impart a heavy smoke flavor but does not remove the 'gaseous phenols' which are part of the Preservation Gasses. The gaseous phenols and aldehydes do impart a minor smoke flavor to the product during smoking but also act to greatly prevent the growth of bacteria (Kristinsson, et al 2005, University of Florida). These flavors are removed at a later step in the processing.

Carbon monoxide (CO) is present in low concentrations in the Preservation Gasses. CO is responsible for the 'locking in' of the existing color of the product through the freezing process. However, at the (low) concentrations found in Clearsmoke, the product loses its color over time in the retail case just as regular product does.

Industrial CO, or highly concentrated CO product is dangerous in that the color never decreases although the quality of the product does; thus creating serious food safety issues. CO is not Clearsmoke and Clearsmoke is not CO, it is wood smoke.

Clearsmoke® products are mostly frozen, thus reducing the risk of high histamine levels.

Exhibit 3
Page 2 of 5



Know more ?
Visit our web site:
www.anovafood.com

# The Clearsmoke® Generation System

Note : The name Clearsmoke® is a registered Trademark of Clearsmoke® Technologies, Inc.



| Hickory Wood Smoke Generator | Particulate Filter | Odor Filter | Clearsmoke Accumulator | Clearsmoke Storage System |

Smoke is generated by using a standard commercial smoke generator that burns hickory wood chips.

The smoke is generated by the burning of the chips on the hotplate of the smoke generator. The smoke is first passed through a Primary Filter which removes all of the particulate (ash, tar, particulate larger than 1 micron) components of the smoke. This is done by a purely passive filtration means and does not concentrate or chemically alter the natural composition of the smoke.

The smoke is then passed through the Secondary Filter which reduces (but does not eliminate) the odor and color components of the smoke. The all important, 'Preservation Gases' are left intact.

The smoke is accumulated in an Accumulation Chamber and then either pumped directly to the 'smoke house' and applied directly to the product, or compressed into storage containers for later use. When the smoke is applied to the product it is going for 'sleep over' at 0 °C to 2 °C. This is followed by an Ozone Step for TPC and smoke odor reduction. Finally the product is vacuum packed and quick frozen.

# Legal issue

The Clearsmoke process is considered GRAS (Generally Recognized as Safe) by the US FDA based on the long term safety standards of wood smoked food products. Millions of pounds of Clearsmoke products are imported into and sold in the United States on a yearly basis

Clearsmoke is a true wood smoke system.

Clearsmoke is legally (Dutch Court Decision Dec, 2004) imported into The Netherlands and distributed throughout the EU at the invitation of each country.

Application for the formal acceptance of the Clearsmoke Wood Smoking Process has been officially made to both DG SANCO in Brussels and the European Foods Safety Authority (EFSA) in Parma, Italy.

Million of kilos of Clearsmoke products are currently imported and sold in the EU on a year basis

The food safety record of Clearsmoke Products is exceptional.





Blane Olson. January 2006

Anova Food  BV
PO Box 3360
5203 DJ 's-Hertogenbosch
The Netherlands



Phone: +-31(0)73 7502000
Fax: +31 (0)73 7502001
E-mail: anova@anovafood.nl
Website: www.anovafood.com

Exhibit 3
Page 3 of 5



Exhibit 3
Page 4 of 5



## Patent Info

### Protected seafood preservation process

Since 2004, Anova Food is the proud owner of the patent number 6,777,012 which sets out now the Clearsmoke® process works. Granted by the U.S. patent office, a patented process is innovative and unique. And that's just what Clearsmoke® is, allowing the fish so treated to preserve color and taste, and reduce bacteria so extending shelf-life, all without the usual taste and smell of a smoke treatment.

Read or download the full U.S. Patent here:

Exhibit 3
Page 5 of 5

**EXHIBIT 4**

DECLARATION OF
ROSALINA M. GETIS

Pursuant to 28 U.S.C. § 1746, I declare that:

I, Rosalina M. Getis, of legal age, married, with residence and postal address at 075 Countryside Subdivision, Leon Llido Street, City Heights, Lagao Road, General Santos City, Philippines, hereby depose and state:

1. I started working as executive secretary and liaison officer for Kingford Enterprises, a single proprietorship, in June 1984. Kingford Enterprises became Philippine Kingford Inc. ("Kingford") on January 25, 1985. My immediate superior was Evelyn Chiu, co-owner of Kingford.

2. As executive secretary, I attended most of the management meetings and represented Evelyn Chiu in her absence during these meetings.

3. As a trusted employee of Kingford, I had complete access to all parts of the Kingford complex and a handled a wide range of issues and documents pertaining to legal, finance, labor, export, import, government licenses, real estate transactions, banking, payroll, customer service, and even the personal groceries for the Chiu household. In other words, I was an all-around employee.

4. To my best recollection, Kingford obtained the technology to create carbon monoxide gas by mixing formic and sulphuric acids from a former employee of PescaRich Manufacturing Corporation in 1998. Shortly thereafter, Kingford began making tuna products treated with carbon monoxide gas around 1998.

5. Kingford began exporting tuna products treated with carbon monoxide gas and not filtered wood smoke in 1998. Kingford's first major customer was Hawaii International Seafood Inc. ("HIS").

6. Kingford tuna products treated with carbon monoxide gas and exported to HIS were marked as treated with "tasteless smoke," not with carbon monoxide even though no smoke was used in the treatment of these products.

7. To my best recollection, William Kowalski ("Kowalski") visited Kingford two or three times in 1998-1999.

8. William Kowalski was fully aware that the tuna products he was buying on behalf of HIS were treated carbon monoxide and not filtered wood smoke and still requested that Kingford label the products as treated with "tasteless smoke."

Exhibit 4
1 of 2

9. Kingford also ordered limited canisters containing tasteless smoke from Kowalski's Batangas plant, but only used these canisters for demonstration purposes. Kingford preferred to use carbon monoxide gas exclusively. Kingford did this because they obtained better color results from using carbon monoxide gas than from using tasteless smoke.

10. To the extent that Kingford ever produced and products with filtered wood smoke, such production was very limited and for demonstration purposes only.  During the time that Kingford sold tuna to Kowalski, Kingford's sale of carbon monoxide treated tuna to Kowalski, which was labeled as treated with "tasteless smoke", was far greater than that which could have been produced by the few canisters of gas purchased from Kowalski.

11. Kingford did not have any means of producing smoke for the treatment of tuna until 2005. In 2005, a smoke machine using coconut husks as fuel source was shipped to Kingford. Upon the direction of Joseph Chiu, husband of Evelyn Chiu, project engineer Larry Duco installed this machine.

12. Up to the time of my resignation from Kingford in January 2006, Kingford used its smoke machine on a limited basis, operating the smoke machine only for demonstration purposes. Kingford continued to use carbon monoxide gas exclusively to treat tuna products until I left in January of 2006.

I declare and verify, under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

IN WITNESS WHEREOF, I have hereunto affixed my signature this 11th day of December, 2006 at General Santos City, Philippines.


ROSALINA M. GETIS

Exhibit 4
2 of 2

**EXHIBIT 5**

Case 2:07-cv-04514-GW-PLA Document 44 Filed 07/14/07

# Urner Barry's Foreign Trade Report

| Num | Importer | Product | Location | USPort | Origin | For. Port | Arrival | Exporter | Qty | Mesr | Pounds | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | ANOVA FOOD | FROZ TUNA PROD | ATLANTA, GA | MIAMI | PHIL R | KAOHSIUNG | 12/17/2004 | PHILIPPINE KINGFORD | 3467 | CTN | 48,179 | |
| 2 | ANOVA FOOD | FROZ TUNA PROD | ATLANTA, GA | MIAMI | PHIL R | KAOHSIUNG | 01/07/2005 | PHILIPPINE KINGFORD | 3479 | CTN | 48,221 | |
| 3 | ANOVA FOOD | FROZ TUNA PROD | ATLANTA, GA | MIAMI | PHIL R | KAOHSIUNG | 01/28/2005 | PHILIPPINE KINGFORD | 4100 | CTN | 44,360 | |
| 4 | ANOVA FOOD | FROZ TUNA PROD | ATLANTA, GA | MIAMI | PHIL R | KAOHSIUNG | 01/28/2005 | PHILIPPINE KINGFORD | 3680 | CTN | 48,470 | |
| 5 | ANOVA FOOD | FROZ TUNA PROD | ATLANTA, GA | LOS ANGELES | PHIL R | HONG KONG | 03/05/2005 | PHILIPPINE KINGFORD | 3467 | CTN | 43,289 | |
| 6 | ANOVA FOOD | FROZ TUNA PROD | ATLANTA, GA | MIAMI | PHIL R | KAOHSIUNG | 03/11/2005 | PHILIPPINE KINGFORD | 3840 | CTN | 46,696 | |
| 7 | ANOVA FOOD | FROZ TUNA PROD | ATLANTA, GA | MIAMI | PHIL R | KAOHSIUNG | 05/12/2005 | PHILIPPINE KINGFORD | 3738 | CTN | 46,524 | |
| 8 | ANOVA FOOD | FROZ TUNA | ATLANTA, GA | PT EVERGLADES | PHIL R | COLON | 06/13/2005 | PHILIPPINE KINGFORD | 3015 | CTN | 45,519 | |
| 9 | ANOVA FOOD | TUNA FISH FROZ | ATLANTA, GA | LONG BEACH | PHIL R | BUSAN | 06/14/2005 | PHILIPPINE KINGFORD | 3334 | CTN | 43,395 | |
| 10 | ANOVA FOOD | FROZ TUNA PROD | ATLANTA, GA | PT EVERGLADES | PHIL R | COLON | 07/14/2005 | PHILIPPINE KINGFORD | 2670 | CTN | 44,252 | |
| 11 | ANOVA FOOD | FROZ TUNA PROD | ATLANTA, GA | MIAMI | PHIL R | BALBOA | 08/03/2005 | PHILIPPINE KINGFORD | 2897 | CTN | 42,687 | |
| 12 | ANOVA FOOD | FROZ TUNA PROD | RIVERVIEW, FL | PT EVERGLADES | PHIL R | COLON | 08/30/2005 | PHILIPPINE KINGFORD | 2936 | CTN | 47,518 | |
| 13 | ANOVA FOOD | FROZ TUNA PROD | RIVERVIEW, FL | MIAMI | PHIL R | BALBOA | 09/07/2005 | PHILIPPINE KINGFORD | 3635 | CTN | 47,111 | |
| 14 | ANOVA FOOD | FROZ TUNA PROD | RIVERVIEW, FL | MIAMI | PHIL R | PUNTA MANZANI | 10/05/2005 | PHILIPPINE KINGFORD | 3520 | CTN | 44,080 | |
| 15 | ANOVA FOOD | FROZ TUNA PROD | RIVERVIEW, FL | MIAMI | PHIL R | BALBOA | 11/30/2005 | PHILIPPINE KINGFORD | 3122 | CTN | 43,948 | |
| 16 | ANOVA FOOD | FROZ TUNA PROD | RIVERVIEW, FL | PT EVERGLADES | PHIL R | COLON | 01/19/2006 | PHILIPPINE KINGFORD | 3201 | CTN | 43,881 | |
| 17 | ANOVA FOOD | FROZ TUNA PROD | RIVERVIEW, FL | MIAMI | PHIL R | HONG KONG | 03/22/2006 | PHILIPPINE KINGFORD | 2245 | CTN | 45,480 | |
| 18 | ANOVA FOOD | FROZ TUNA PROD | RIVERVIEW, FL | MIAMI | PHIL R | HONG KONG | 04/19/2006 | PHILIPPINE KINGFORD | 3062 | CTN | 47,408 | |
| 19 | ANOVA FOOD | FROZ TUNA PROD | RIVERVIEW, FL | MIAMI | PHIL R | HONG KONG | 05/05/2006 | PHILIPPINE KINGFORD | 3249 | CTN | 48,056 | |
| 20 | ANOVA FOOD | FROZ TUNA PROD | RIVERVIEW, FL | MIAMI | PHIL R | HONG KONG | 06/07/2006 | PHILIPPINE KINGFORD | 3561 | CTN | 45,435 | |
| 21 | ANOVA FOOD | FROZ TUNA PROD | RIVERVIEW, FL | MIAMI | PHIL R | KAOHSIUNG | 06/29/2006 | PHILIPPINE KINGFORD | 4037 | CTN | 43,273 | |
| 22 | ANOVA FOOD | FROZ TUNA PROD | RIVERVIEW, FL | MIAMI | PHIL R | KAOHSIUNG | 06/29/2006 | PHILIPPINE KINGFORD | 2560 | CTN | 43,412 | |
| 23 | ANOVA FOOD | FROZ TUNA PROD | RIVERVIEW, FL | MIAMI | PHIL R | KAOHSIUNG | 07/13/2006 | PHILIPPINE KINGFORD | 3550 | CTN | 43,412 | |
| 24 | ANOVA FOOD | FROZ TUNA PROD | RIVERVIEW, FL | MIAMI | PHIL R | KAOHSIUNG | 08/17/2006 | PHILIPPINE KINGFORD | 3402 | CTN | 43,727 | |
| 25 | ANOVA FOOD | FROZ TUNA PROD | RIVERVIEW, FL | MIAMI | PHIL R | KAOHSIUNG | 08/10/2006 | PHILIPPINE KINGFORD | 2850 | CTN | 43,412 | |
| 26 | ANOVA FOOD | FROZ TUNA PROD | RIVERVIEW, FL | LOS ANGELES | PHIL R | KAOHSIUNG | 09/02/2006 | PHILIPPINE KINGFORD | 3046 | CTN | 48,376 | |
| 27 | ANOVA FOOD | FROZ TUNA PROD | RIVERVIEW, FL | MIAMI | PHIL R | KAOHSIUNG | 10/26/2006 | PHILIPPINE KINGFORD | 3428 | CTN | 42,601 | |
| 28 | ANOVA FOOD | FROZ TUNA PROD | RIVERVIEW, FL | MIAMI | PHIL R | KAOHSIUNG | 12/01/2006 | PHILIPPINE KINGFORD | 3321 | CTN | 43,873 | |
| 29 | ANOVA FOOD | FROZ TUNA PROD | RIVERVIEW, FL | MIAMI | PHIL R | KAOHSIUNG | 12/28/2006 | PHILIPPINE KINGFORD | 3106 | CTN | 43,818 | |
| 30 | ANOVA FOOD | FROZ TUNA PROD | RIVERVIEW, FL | MIAMI | PHIL R | KAOHSIUNG | 02/01/2007 | PHILIPPINE KINGFORD | 3300 | CTN | 45,442 | |
| 31 | ANOVA FOOD | FROZ TUNA PROD | RIVERVIEW, FL | MIAMI | PHIL R | HONG KONG | 03/07/2007 | PHILIPPINE KINGFORD | 3493 | CTN | 47,421 | |
| 32 | ANOVA FOOD | FROZ TUNA PROD | RIVERVIEW, FL | MIAMI | PHIL R | KAOHSIUNG | 05/10/2007 | PHILIPPINE KINGFORD | 3508 | CTN | 43,818 | |
| 33 | ANOVA FOOD | FROZ SEAFOODS | ATLANTA, GA | LOS ANGELES | PHIL R | KAOHSIUNG | 09/01/2002 | PHILIPPINE KINGFORD | 3416 | CTN | 44,989 | |
| 34 | ANOVA FOOD | FROZ TUNA STEAKS & LOINS | ATLANTA, GA | MIAMI | PHIL R | KAOHSIUNG | 01/21/2003 | PHIL KINGFORD | 3045 | CTN | 43,042 | |
| 35 | ANOVA FOOD | FROZ TUNA | ATLANTA, GA | MIAMI | PHIL R | KAOHSIUNG | 03/27/2003 | PHIL KINGFORD | 2765 | CTN | 43,613 | |
| 36 | ANOVA FOOD | FROZ TUNA | ATLANTA, GA | MIAMI | PHIL R | KAOHSIUNG | 05/16/2003 | PHIL KINGFORD | 3139 | CTN | 39,881 | |
| 37 | ANOVA FOOD | FROZ TUNA | ATLANTA, GA | MIAMI | PHIL R | KAOHSIUNG | 06/16/2003 | PHIL KINGFORD | 2744 | CTN | 43,670 | |
| 38 | ANOVA FOOD | FROZ TUNA PROD | ATLANTA, GA | MIAMI | PHIL R | KAOHSIUNG | 09/11/2003 | PHILIPPINE KINGFORD | 2504 | CTN | 43,864 | |
| 39 | ANOVA FOOD | FROZ TUNA & SWORDFISH PROD | ATLANTA, GA | MIAMI | PHIL R | KAOHSIUNG | 12/05/2003 | PHILIPPINE KINGFORD | 2867 | CTN | 43,679 | |
| 40 | ANOVA FOOD | FROZ TUNA PROD | ATLANTA, GA | MIAMI | PHIL R | KAOHSIUNG | 04/02/2004 | PHILIPPINE KINGFORD | 2583 | CTN | 43,952 | |
| 41 | ANOVA FOOD | FROZ TUNA PROD | ATLANTA, GA | MIAMI | PHIL R | KAOHSIUNG | 05/07/2004 | PHILIPPINE KINGFORD | 2273 | CTN | 43,558 | |
| 42 | ANOVA FOOD | FROZ TUNA | ATLANTA, GA | MIAMI | PHIL R | KAOHSIUNG | 05/27/2004 | PHILIPPINE KINGFORD | 2338 | CTN | 43,555 | 1,880,897 |

Total Shipments : 42 and Total Pounds for this period : 1,880,897

Exhibit 5

**EXHIBIT 6**





...*your natural seafood solution*

AMERICA

NEWS & VIEWS    BUYERS INFO    CONSUMER INFO    ABOUT ANOVA    CLEARSMOKE®    EMPLOYMENT

Who We Are         Sourcing         Quality Assurance       Contact

about anova > quality assurance







## Our Quality Assurance Program

**Quality Assurance makes common sense**
It has always been our second nature to ensure that the fish we sell reaches our customers in top condition. Not only does this give us an edge on most competition, it also means that we satisfy the demands of the regulatory bodies in advance of legislation. At the heart of this lie our Quality Assurance Program and our Quality Control Procedures.

**A four-point strategy for Quality Assurance:**

1. **Follow and aim for the highest standard**
   Our certified processes (EN-ISO, HACCP and BRC) form the core of our Quality Assurance, from supplier to our customer's door.
2. **One quality worldwide**
   Our tracking and tracing system is integrated worldwide. We communicate through integrated servers, and our quality staff number 14 people in 7 countries. We operate a supplier rating system that ensures we only choose the best.
3. **Pro-active communication**
   We provide clear and accurate product specifications to our customers and in the unlikely event that we see a delivery that does not meet our standards, our recall procedures have proven to be efficient.
4. **Educate to stay ahead**
   We ensure that our workforce and our suppliers remain up to date in their knowledge of cutting-edge procedures and practices.

**Standardized Quality Control Procedures Worldwide:**
Embedded in our processes lie standardized procedures for the food safety. These include:

- **An integrated Tracking and Tracing system**
- **Sampling fresh fish flights at arrival\***
- **Sampling frozen fish shipments at arrival\***
- **Inspection on fish on organoleptics at our suppliers**
- **Daily monitoring and vendor rating (by making quality reports)**
- **Verification and validation of quality systems and procedures**
- **Internal and external audits by Bureau Veritas Quality International**

**\*Samples are tested and analyzed by accredited laboratories for; histamines, bacteria levels, chemical residues and pesticide residues.**





search

Take me to:
Choose language
Product info:

Sitemap   Disclaimer
Privacy Statement

Exhibit 6

Robert C. Pearman, Jr., Esq./Gerald Greene, Esq.
ROBINSON & PEARMAN LLP
555 West 5th Street, 31st Floor
Los Angeles, California 90013

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| KING TUNA, INC.  a California corporation <br><br> PLAINTIFF(S) <br><br> v. <br><br> ANOVA FOOD, INC., a Georgia corporation <br><br><br><br> DEFENDANT(S). | CASE NUMBER <br><br> CV07-07451 ODW (JWJx) <br><br><br> **SUMMONS** |

TO:     THE ABOVE-NAMED DEFENDANT(S):

YOU ARE HEREBY SUMMONED and required to file with this court and serve upon plaintiff's attorney
Robert C. Pearman, Jr., Esq./Gerald Greene, Esq.     , whose address is:

ROBINSON & PEARMAN LLP
555 West 5th Street, 31st Floor
Los Angeles, Calfironia 90013

an answer to the ☒ complaint ☐_____amended complaint ☐ counterclaim ☐ cross-claim
which is herewith served upon you within __20__ days after service of this Summons upon you, exclusive
of the day of service. If you fail to do so, judgement by default will be taken against you for the relief
demanded in the complaint.

Clerk, U.S. District Court

Dated: ___NOV 14 2007___

By: _____
**LA'REE HORN**
Deputy Clerk

1171

Robert C. Pearman, Jr., Esq./Gerald Greene, Esq.
ROBINSON & PEARMAN LLP
555 West 5th Street, 31st Floor
Los Angeles, California 90013

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| KING TUNA, INC.  a California corporation<br><br>                                        PLAINTIFF(S)<br>                        v.<br>ANOVA FOOD, INC., a Georgia corporation<br><br><br><br>                                        DEFENDANT(S). | CASE NUMBER<br><br>CV07-07451ODW (JWJx)<br><br><br>**SUMMONS** |

TO:     THE ABOVE-NAMED DEFENDANT(S):

YOU ARE HEREBY SUMMONED and required to file with this court and serve upon plaintiff's attorney
Robert C. Pearman, Jr., Esq./Gerald Greene, Esq.   , whose address is:

ROBINSON & PEARMAN LLP
555 West 5th Street, 31st Floor
Los Angeles, Calfiornia 90013

an answer to the  ☒ complaint ☐_____amended complaint ☐ counterclaim ☐ cross-claim
which is herewith served upon you within __20__ days after service of this Summons upon you, exclusive
of the day of service. If you fail to do so, judgement by default will be taken against you for the relief
demanded in the complaint.

Clerk, U.S. District Court

Dated: ___NOV 1 4 2007___

By:_____
                Deputy Clerk

*(Seal of the Court)*

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

| | |
|---|---|
| **I (a) PLAINTIFFS** (Check box if you are representing yourself ☐)<br><br>KING TUNA, INC. | **DEFENDANTS**<br><br>ANOVA FOOD, INC. |
| **(b)** County of Residence of First Listed Plaintiff (Except in U.S. Plaintiff Cases):<br>Los Angeles, California | County of Residence of First Listed Defendant (In U.S. Plaintiff Cases Only):<br>Georgia |
| **(c)** Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)<br>Robert C. Pearman, Jr., ROBINSON & PEARMAN LLP, 555 West 5th Street, 31st Floor, Los Angeles, California 90013, Tel (213) 533-4125 | Attorneys (If Known) |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

- ☐ 1 U.S. Government Plaintiff
- ☑ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☑ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☑ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

- ☑ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify):
- ☐ 6 Multi-District Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☑ Yes ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes ☐ No   ☐ **MONEY DEMANDED IN COMPLAINT: $** _____

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
15 U.S.C. § 1125; 35 U.S.C. § 292

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 530 General | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 535 Death Penalty | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | **BANKRUPTCY** | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | ☐ 151 Medicare Act | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | **FORFEITURE / PENALTY** | **PROPERTY RIGHTS** |
| ☐ 490 Cable/Sat TV | | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 810 Selective Service | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 850 Securities/Commodities /Exchange | ☐ 160 Stockholders' Suits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☑ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 190 Other Contract | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | | **SOCIAL SECURITY** |
| ☐ 890 Other Statutory Actions | ☐ 195 Contract Product Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | ☐ 196 Franchise | | ☐ 445 American with Disabilities - Employment | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | **REAL PROPERTY** | | ☐ 446 American with Disabilities - Other | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | ☐ 210 Land Condemnation | | ☐ 440 Other Civil Rights | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 220 Foreclosure | | | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 230 Rent Lease & Ejectment | | | | **FEDERAL TAX SUITS** |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 240 Torts to Land | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | | | | |

**VIII(a). IDENTICAL CASES:** Has this action been previously filed and dismissed, remanded or closed? ☐ No ☑ Yes

If yes, list case number(s): US District Court, Oregon - Civ. No. 07-6191-TC

**FOR OFFICE USE ONLY:** Case Number: _____

CV-71 (07/05)                    CIVIL COVER SHEET                    Page 1 of 2

**CV07-07451**

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

**AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.**

VIII(b).  **RELATED CASES:** Have any cases been previously filed that are related to the present case? ☑ No   ☐ Yes

If yes, list case number(s): _____

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply)   ☐ A.  Arise from the same or closely related transactions, happenings, or events; or

☐ B.  Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C.  For other reasons would entail substantial duplication of labor if heard by different judges; or

☐ D.  Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

---

IX. **VENUE:** List the California County, or State if other than California, in which **EACH** named plaintiff resides (Use an additional sheet if necessary)
☐ Check here if the U.S. government, its agencies or employees is a named plaintiff.

KING TUNA, INC. - Los Angeles County

List the California County, or State if other than California, in which **EACH** named defendant resides.  (Use an additional sheet if necessary).
☐  Check here if the U.S. government, its agencies or employees is a named defendant.

ANOVA FOOD, INC. - Georgia

List the California County, or State if other than California, in which **EACH** claim arose.  (Use an additional sheet if necessary)
Note: In land condemnation cases, use the location of the tract of land involved.

X. **SIGNATURE OF ATTORNEY (OR PRO PER):** _/s/ Robert Perusso_____   Date   November _13_, 2007

Notice to Counsel/Parties:  The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law.  This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet.  (For more detailed instructions, see separate instructions sheet.)

---

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended.  (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended.  (42 U.S.C. (g)) |