1
2
3
4
5
6
7
8
9

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# WESTERN DIVISION

| | |
|---|---|
| KING TUNA, INC., a California corporation,<br><br>          Plaintiff,<br><br>     vs.<br><br>ANOVA FOOD, INC., a Georgia corporation,<br><br>          Defendant. | Case No. CV07-07451 ODW (AJWx)<br><br>FINDINGS OF FACT AND CONCLUSIONS OF LAW ON DEFENDANT & COUNTERCLAIMANT ANOVA FOOD, INC.'S MOTION FOR JUDGMENT ON PARTIAL FINDINGS, F.R.CIV.P. RULE 52(c) |

On May 14, 2010 at the conclusion of the presentation of evidence in the Plaintiff's case in chief, Defendant and Counterclaimant Anova Food, Inc. ("Anova"), made a Motion For Judgment On Partial Findings.  That motion was granted.  Following briefing by the parties, the Court makes the following findings of fact and conclusions of law:

### FINDINGS AS TO THE CLAIMS BY KING TUNA, INC.:

1.     Plaintiff King Tuna, Inc., a California corporation ("King Tuna") filed a Second Amended Complaint ("SAC") on April 4, 2008 (Doc. 64), against Defendant and Counterclaimant Anova Food, Inc., a Georgia corporation ("Anova").  That is the current and operative pleading in this case and sets forth the issues to be tried, as modified and superseded by the final Pretrial Conference Order of April 19, 2010 ("PTCO").

2.      King Tuna limited its false advertising claims in the PTCO as follows:

    a. **Claim Statement 1**:  "Since 2004 Anova Inc. has been processing
seafood using the Clearsmoke® process taught under US Patent No.
6,777,012.  This process uses filtered wood smoke and ozone to treat
food products. This process does not use synthetic carbon monoxide
(CO) to treat food products" (PTCO at 10:16-21).

    b. **Claim Statement 2:**  "Anova Food, Inc.'s Clearsmoke® process only
uses one ingredient to generate smoke and that is Hickory Wood Chips.
The Clearsmoke® process begins with Hickory Wood Chips from
Wisconsin or Tennessee which are the highest food grade quality and
fully traceable to FDA standards.  By taking the natural preservative
qualities of the Hickory Wood Smoke and filtering out the unnecessary
smoke flavor elements, Anova Inc. retains all the advantages of the
smoking process" (PTCO at 12:5-11).

    c. **Claim Statement 3**: "Anova Food Inc's Clearsmoke® branded
products are considered GRAS (generally recognized as safe) by the US
FDA" (*Id*.,12:15-17).

    d. **Claim Statement 4**: "Anova Food, Inc. has a detailed Quality
Assurance Program and Quality Control Procedures governing its
Clearsmoke® process and product" (PTCO at 13:2-4).

## JURISDICTIONAL, STANDING AND F.R.CIV.P. RULE 12(B) ISSUES:

2.      Jurisdiction is based on 28 U.S.C. § 1331, 28 U.S.C. § 1338, for claims
made under the Lanham Act, 15 U.S.C. § 1051 *et seq*. and for Anova's claims under
patent mismarking laws, 35 U.S.C. 292 *et seq*.   This court has supplemental
jurisdiction for claims under Cal. *Bus. & Prof.* Code §§ 17200, 17500 *et seq.* pursuant
to 28 U.S.C. § 1367.   King Tuna and Anova Inc. are "competitors selling frozen
seafood products in the United States, including raw tuna treated with filtered wood
smoke ('FWS')" (PTCO, p. 1:11-20; stipulated fact # 3 at 2:6-7). Each party allegedly

1  sustained losses as a result of alleged false advertisements of the other (*Id.*).  Venue is
2  proper under 28 U.S.C. § 1391.

3      3.      The relevant damages period is January 2004 to September 30, 2008.  On
4  September 30, 2008, King Tuna voluntarily stopped selling FWS labeled tuna.
5  However, King Tuna alleges in the PTCO that it is again selling FWS tuna.

6
7  ### BACKGROUND FACTS RE KING TUNA:

8      4.      King Tuna was formed as a California corporation in late 2003 (PTCO
9  stipulated fact # 22 at 4:2).  Mr. Joaquin "Jake" Lu has a majority ownership interest
10 in King Tuna (PTCO stipulated fact # 28 at 4:15).

11     5.      Between 2004 and 2008, King Tuna imported in excess of 7,109,000
12 pounds of tuna products into the United States (PTCO stipulated fact # 23 at 4:3-4).

14     6.      Substantially all of King Tuna's seafood products imported into the
15 United States were imported from Citra Mina Seafood Corporation ("Citra Mina") and
16 Mommy Gina Tuna Resources ("MGTR"), both located in the Philippines (PTCO
17 stipulated fact # 25 at 4:8-10).  MGTR was a sole proprietorship and Joaquin Lu was
18 the owner/sole proprietor until it was incorporated (PTCO stipulated fact # 26 at 4:11-
19 12).  Mr. Joaquin Lu and/or members of his family own a majority interest in Citra
20 Mina Seafood Corporation ("Citra Mina") (PTCO stipulated fact # 27 at 4:13-14).

21     7.      Mr. Joaquin Lu and his family controlled King Tuna and its two
22 suppliers, MGTR and Citra Mina during the relevant damages period.

23
24 ### BACKGROUND FACTS AS TO ANOVA FOOD INC.

25     8.      Anova at all relevant times since 1998 was a Georgia corporation with
26 its principal place of business in Tampa, Florida, and with its Quality Control office in
27 Miami, Florida (PTCO stipulated fact #1 at 2:2-3; Purinton Testimony).  In about
28 1998-1999, Anova entered the business of selling seafood, including tuna products,

3

preserved with FWS in the United States. Anova's President during the relevant damages period herein has been Douglas Brinsmade ("Brinsmade").

9.     The primary active ingredient in FWS for preserving seafood is carbon monoxide ("CO").  Carbon dioxide and certain hydrocarbons produced in the FWS process kill bacteria and also aid in the preservation process.

10.   Between 1998 and August 2004, Blane E. Olson ("Olson"), assisted by Brinsmade, worked to develop a patented process for preserving seafood, including tuna.   On August 17, 2004, the United States Patent and Trademark Office ("USPTO") issued Patent # 6,777,012 to Olson and Brinsmade as co-inventors. ("Olson '012 patent") admitted as Trial Exhibit 131.   Though he held various positions with Clearsmoke Technologies, Olson was never an officer, director or managing agent of Anova, nor a shareholder of Anova Holding USA (which owns Anova Foods Inc.) until mid-2008.  .

11.   From 2001 to the present, Anova and Clearsmoke Technologies have been sister corporations, each owned by Anova Holdings BV, a Netherlands company ("Holdings BV") until January 2008, and then owned by Anova Holdings USA, LLC up to the present.  (Brinsmade Testimony)

12.   Anova has a seafood product line that includes tuna, treated with the Clearsmoke® process (PTCO stipulated fact # 6 at p. 2:16-17).   The Olson '012 Patent sets out part of the Clearsmoke® process for preserving seafood (PTCO stipulated fact # 7 at p. 2:18-19).

13.   In 1999, Olson and Brinsmade designed and built a smoke machine for producing FWS that was installed at the Clearsmoke Technologies site in Atlanta, Georgia.   Mr. James Barnett, a field agent with the Federal Drug Administration ("FDA") with responsibility for processed seafood, including tuna, for 33 years, inspected the Atlanta smoke machine twice, in the late 1990's or 2000-2001, and saw

4

it producing filtered wood smoke.

14.     Anova imports tuna products to which a preservative (FWS or CO, labeled as such) has been added.   Anova's tuna products are purchased from independently owned and operated seafood processors located throughout the world, including Philippine Kingford ("Kingford") until September 2007.   Anova resells the seafood products mainly to wholesale distributors that resell to supermarkets, restaurants and/or retailers, and to other distributors in the United States (PTCO stipulated fact # 4 at p. 2:9-14; Brinsmade and Purinton testimony).

15.     The Kingford facility was the only Anova seafood supplier that had its own smoke machine.   Except for a few private label sales, all other Anova seafood suppliers received FWS from Clearsmoke Technologies made on Clearsmoke Technologies owned and operated machines (PTCO stipulated fact # 12 at p. 3:5-7). Clearsmoke Technologies supplied the Clearsmoke® FWS to the Anova tuna suppliers in high-pressure steel cylinders shipped directly to the tuna suppliers from the Clearsmoke Technologies. (Barnett testimony).

16.     The Anova Food BV Netherlands web pages that form the basis of Plaintiff's false advertising claim in the SAC were viewable during the period of 22 August 2005 to 21 May 2007 (PTCO stipulated fact # 29 at p. 3:25-26).   However, there was no evidence of any USA based customers of Anova viewing this website or if so whether these website pages were material or even considered in the purchasing decisions of Anova's USA customers.   Nor did King Tuna account for the effect on any purchasing decisions of Anova's U.S. customers of the disclaimer referenced on every page of the Anova Food BV website containing product descriptions.

17.     Anova inspected or caused inspections to be made of all its suppliers of branded frozen tuna products sold under the Anova Foods Inc. brand, and relied on inspections by the United States Department of Commerce ("USDC") which conducted semi-annual inspections of significant worldwide suppliers of seafood sold

to Anova Inc., including of Kingford (PTCO stipulated fact # 9 at 2:24-27; Barnett Testimony).

18.     Anova received and reviewed reports of product inspection and routine U.S. laboratory test results for tuna products shipped to Anova by Kingford, including the reports of semi-annual inspections by the USDC of Kingford (PTCO stipulated fact # 10 at 2:28 to 3:2).

19.     Anova sold its FWS tuna products under different "brands:" (a) the Anova brand, (b) the MyFish brand, (c) the Clearsmoke® brand, and (d) some private label brands.  FWS tuna sold only under the Anova brand and MyFish brands were not processed under the full Clearsmoke® process but under just the Olson '012 patent.  Some private label brand FWS tuna was processed under the Clearsmoke® process, but some was not.  The product processed by the Clearsmoke® method was labeled with the Clearsmoke® brand logo

20.     The Olson '012 patent did not require hickory chips as a fuel source for producing FWS; it only required a generic "organic material" as fuel to make FWS (Trial Exh. 131).  Coconut shells are one such source of organic material.  Thus, tuna sold under the Anova or MyFish brands did not require use of hickory wood chips to make the FWS.  Nor did the Olson '012 patent specify a temperature range for burning fuel in the smoke machine to create FWS.

21.     Consistent with the Olson '012 patent, Anova suppliers washed all tuna either with ozone in water suspension or with ozone gas during the process of preserving the seafood.  The Olson '012 patent also permitted the option of using ethanol alcohol to help preserve the tuna.  The tuna processed by Thai Ocean Ventures, the Thailand supplier of seafood to Anova Inc., used an ethanol alcohol scrub of the tuna after it was smoked and treated with ozone in a final step before packaging and freezing the tuna (Hender Moran testimony).

22.   Seafood sold under the Clearsmoke® brand was different from Anova's other brands.  Although the Clearsmoke® process incorporated and used the Olson '012 patent process, it went beyond that process in that it used Clearsmoke® FWS that was made with hickory chips, was sold under the Clearsmoke® brand and shipped in boxes labeled "Clearsmoke®" brand.  The Clearsmoke® brand was only licensed for use by Anova's independent seafood suppliers after Clearsmoke Technologies first approved that seafood supplier to use the Clearsmoke® Process and only on seafood that was of high quality, color and cuts.

23.   Kingford's co-owner, Mr. Joseph Chiu, invented and used his own smoke machine on Kingford's Philippine premises since 2002-2003 for producing FWS used in processing of tuna for Anova Inc.  Mr. Chiu filed a patent application for that smoke machine on January 27, 2004 and a patent was issued thereafter (Trial Exh. 712).  Mr. Chiu's smoke machine was in use at Kingford from about 2002-2003 while in the process of being patented (Larry Duco video deposition testimony).

## FINDINGS ON SUBSTANTIVE ISSUES

### A.   The GRAS Issue (PARAGRAPH 2(C) ABOVE)

24.   The Court finds that there was no false advertisement with respect to the assertion that the Clearsmoke® process is GRAS (see paragraph 2(c) above).  In fact, the Court finds that the FDA, at least by November 2, 2004, approved Clearsmoke® FWS as Generally Recognized As Safe ("GRAS") without any temperature limitation in the creation of the FWS as evidenced by a letter from the FDA to the Brazilian Government (Trial Exh. 706).  There was no evidence to the contrary.

25.   King Tuna belatedly claimed that Anova falsely advertised by claiming its suppliers' HACCP plans were approved by the USDC and FDA.  A HACCP plan includes a description of the basic process by which seafood is treated by a seafood supplier. However, that claim is also rejected, as the evidence was clear that the

USDC approved Anova's independent suppliers on a published list of "approved" seafood processors after inspecting and approving their HACCP plans and the process actually used at their facilities (Barnett Testimony).  That was an approval of the HACCP plan and the "process" for producing seafood used at the facilities according to FDA standards, but not of the individual seafood products produced there (Trial Exh. 181, pp. 1, 3; Barnett Testimony). This issue falls outside the scope of the PTCO (See 2 supra, and is therefore irrelevant.)

### THE QUALITY ASSURANCE--QUALITY CONTROL ISSUE (PARAGRAPH 4(B) ABOVE)

26.   Anova had a fully functional Quality Control/Quality Assurance program, contrary to the claims of King Tuna.  There were no confirmed cases of foodborne illness from the Anova Inc. product after millions of pounds of FWS tuna were shipped and sold to USA customers.

27.   Anova working with Clearsmoke Technologies took reasonable steps to ensure that its independent suppliers made FWS tuna using the Clearsmoke® process. Those reasonable steps included, but are not limited to, the following:

a. Clearsmoke Technologies required the Anova seafood suppliers to buy sufficient Clearsmoke® FWS shipped via cylinders to process the quantities of tuna being processed.  (Barnett Testimony).

b. Clearsmoke Technologies personnel compared the shipment quantities of FWS against the number of pounds of tuna being produced by each Anova seafood supplier to ensure that all seafood was being processed using Clearsmoke® FWS. Clearsmoke Technologies kept records of the quantity of FWS cylinders sold to each Anova supplier, and each supplier also provided the total pounds of tuna processed and sold to Anova so Clearsmoke Technologies could do that comparison. (Barnett Testimony)

c. Anova and Clearsmoke Technologies did periodic inspection visits to

Anova's suppliers to make sure they were properly processing tuna sold to Anova Inc. according to the Clearsmoke® Process.  The only exception was at Kingford due to safety concerns in that part of the Philippines based on U.S. State Department travel advisory warnings.  But additional inspections of Kingford shipments were done by the Anova Inc. Quality Control team in Miami, Florida when the Kingford shipments arrived in the USA.  This was to compensate for the lack of onsite inspections at the Kingford plant.

d. Anova and Clearsmoke Technologies also relied on periodic inspection visits made by the United States Department of Commerce ("USDC"), the government agency charged with ensuring that foreign seafood suppliers complied with applicable FDA regulations.  Anova and/or Clearsmoke Technologies reviewed the USDC inspection reports to ensure that the Clearsmoke® Process was employed at each of its seafood suppliers, including reports of Kingford inspections.

28.   In addition to the smoke machine and operation installed in Atlanta, GA, Clearsmoke Technologies also added several other smoke machines and operations to supply FWS to its independent tuna suppliers, three of which James Barnett of the FDA inspected more than once in each location (Atlanta, Ecuador and Bali, Indonesia), one of which Bill Bonzheim inspected (Tampa, Florida), and one of which Hender Moran inspected (the Clearsmoke smoke operation in Thailand near Thai Ocean Ventures, the sole Thailand seafood supplier to Anova Inc.).

29.   Dr. Mark Hagadone, King Tuna's science expert, offered his October 2009 tests as proof that Anova's tuna suppliers did not follow the Clearsmoke® process.  The Court finds Dr. Hagadone's October 2009 tests are unreliable.  The Court therefore rejects the October 2009 tests as lacking in evidentiary value. This is supported by, but not limited to, the following facts:

a. Dr. Hagadone testified at trial that the tuna samples received by his lab  were

9

in "hermetically sealed" packages.   However, his own laboratory notes showed the opposite.   The notes revealed that some of the packages were received with broken packaging, were discolored, had ice crystals forming, were "brownish" and were "smelly."   That indicates decomposition by improper handling.   Further, no testing was done to determine the amount of decomposition of the alleged tuna samples nor the effect it would have on his testing.

b.   Dr. Hagadone was obligated as an independent expert to maintain the packaging of the tuna samples to verify their origin. The thrust of his testimony was that his test results showed levels of hydrocarbons inconsistent with processing via the FWS method.  Evidence throughout the trial was to the effect that not all tuna is processed by that method.  Some tuna is processed using straight CO.  The question is whether the labeling accurately described the processing method used on the product within the package.  Inexplicably, his office destroyed the packaging after removing the tuna for testing, and never took photographs of the packaging.  This failure in the context of a false advertising case, coupled with his failure to maintain packaging integrity completely undermine the validity of his assertions.  There were also chain of custody issues which were not resolved by the plaintiff to the court's satisfaction.   Instead of Dr. Hagadone having the tuna samples shipped directly to his laboratory from the supplier, they apparently were shipped to an investigator acting on behalf of plaintiff's counsel who then maintained custody of them for some period of time.  The conditions under which the product were maintained in counsel's office were not disclosed.  Sometime later, the product was delivered to Dr. Hagadone's laboratory and received in a state of decomposition.

c.   Dr. Hagadone testified that in his opinion Mr. Crowell, counsel for plaintiff, was "independent" for chain of custody purposes.  This assertion only served

FINDINGS OF FACT & CONCLUSIONS OF LAW

to cast further doubt on his scientific neutrality and credibility.

d.  The court also notes that Dr. Hagadone's laboratory was not accredited to do food testing.  He also was not approved by the FDA to do tests of this kind for the FDA.  He admitted his own laboratory accreditations did not cover the October 2009 tests.

e.  The evidentiary value of the testing was called into further question by Dr. Hagadone's admission that the experimental laboratory testing done in October 2009 did not exist between 2004 and 2008, and he admitted (i) it was the first time he or anybody else to his knowledge had done such tests, (ii) they were experimental, (iii) had never been done before by his lab, and (iv) he was "feeling his way" along with such tests.

f.  Dr. Hagadone's testing is not accepted nor recognized by FDA, the USDC, (the agencies with jurisdiction over Anova's independent tuna suppliers,) nor accepted or recognized by any laboratory accreditation agency.

**Claim That Olson '012 Patent Not Followed [CO vs. FWS & Ozone; see ¶ 4(a)]**

30.    There is no evidence that Anova falsely advertised that any its tuna purportedly treated with FWS and ozone was instead treated with straight CO, whether sold as Anova Brand, MyFish brand or Clearsmoke® Brand tuna.

31.    There is no evidence that Anova's independent suppliers processed tuna with other than "low levels of CO" in the FWS. The FDA and seafood industry generally consider levels of CO less than 50% in FWS to be "low" concentrations of CO (Barnett Testimony; Brinsmade Testimony; Dr. Hagadone testimony).   Mr. Joaquin Lu's testimony that low levels of CO in FWS were below 20% CO content was not credible.  But more to the point, King Tuna failed to produce any evidence of the CO levels of any Anova tuna advertised as FWS or processed by the Clearsmoke® method so as to demonstrate that the product was falsely advertised.

11
**FINDINGS OF FACT & CONCLUSIONS OF LAW**

32.    To the extent that Dr. Hagadone's testimony about his October 2009 tests was designed to demonstrate the falsity of Anova Inc.'s advertising, those tests and his testimony are rejected for the reasons cited above.

33.    King Tuna failed to produce evidence that it actually lost specific sales or customers to Anova due to alleged false advertising.  King Tuna did no customer surveys of any of Anova's hundreds of customers, nor of its customers that bought tuna supplied by Kingford.

34.   King Tuna offered only one example of a purported lost customer or lost sales to Anova: Bill Bonzheim of Roundy's Supermarkets.    However, Bill Bonzheim's deposition, taken after Bonzheim's prior declaration prepared by King Tuna counsel, established that King Tuna never lost sales to Anova  when Roundy's adding Anova as a tuna supplier.  Anova was added as a separate product line at Roundy's. Bonzheim  testified that after adding Anova tuna as a separate product line, King Tuna's sales to Roundy's "actually increased"  (Bonzheim Depo. at 66:9-14).

35.    Moreover, Mr. Bonzheim also testified that his decision to buy Anova tuna was not due to advertising nor on what Mr. Brinsmade told him about the process, but from his first-hand inspection of the process to create and treat tuna with FWS.  (Bonzheim Depo., 16:14 to 18:19; 59:14 to 60:21).

36.    Finally, Bonzheim also testified that had he known about King Tuna's willful patent infringement (that continued from January 2004 through September 30, 2008 when it stopped selling FWS tuna), he would not have bought tuna from King Tuna, because "it's illegal and unethical" (Bonzheim Depo., 65:15-21).

### THE HICKORY CHIPS VS. COCONUT SHELLS ISSUE (¶ 4(D) ABOVE)

37.    The Court finds there was no false advertising based on the "one ingredient only--hickory wood chips" statement on the Anova BV website or brochure because the FWS produced at Kingford with coconut shells was never sold under the

Clearsmoke® brand but was processed under the Olson '012 patent.  The Olson '012 patent only required that a generic organic material be used for producing FWS, and coconut shells are a source of such an organic material.

38.    Although Kingford was approved to *become* a Clearsmoke® brand supplier of tuna on February 19, 2006, it never fully implemented the Clearsmoke® Process, which requires use of hickory wood chips to make the FWS.

39.    Kingford did not receive hickory chips until late 2006 or early 2007, during the TPI v. Kingford arbitration.  Kingford decided not to use hickory chips or to fully implement the Clearsmoke® process.  But the only issue relevant to the court's inquiry is that Kingford never sold or marked its tuna boxes with Clearsmoke® brand labels or logos and no evidence was introduced at trial to the contrary.

40.    The tuna boxes and labels used to ship and package the tuna from Kingford were approved by Scott Purinton of Anova Inc. in mid-March, 2006, after the February 19, 2006 approval for Kingford to *become* a Clearsmoke® brand supplier, *but did not include a Clearsmoke® Brand or Logo* (Trial Exh. 721).

41.    During the TPI arbitration when an issue was made of the hickory chips vs. coconut shells, in an abundance of caution, Anova Inc. sent a letter on May 21, 2007, drafted by Olson who asked Purinton to sign it, to the recent Anova Inc. major customers of Kingford FWS tuna (Trial Exh. 186).  The May 21, 2007 letter was drafted by Blane Olson based on his erroneous assumption that since he approved Kingford to become a Clearsmoke® brand supplier, and had helped Kingford to obtain the hickory wood chips necessary to fully implement the Clearsmoke® process, he assumed Kingford had been selling under the Clearsmoke® brand label and logo. In the letter, it stated the Anova Food BV website advertisement as it related to Clearsmoke® brand tuna shipped from Kingford was not correct, apologized if this misled anyone, and stated that they were taking steps to implement by August 2007,

the hickory chips portion of the FWS for Kingford.  However, by August of 2007, Kingford had gone out of the FWS business.  In any event, Kingford never shipped any product using the Clearsmoke® brand label and logo.

42.    On May 22, 2007, the Anova BV website in the Netherlands (Anova had no website of its own in the USA) was changed to reflect that the "one ingredient only--Hickory wood chips" statement did not apply to the Philippine supplier, which referred to Kingford (PTCO stipulated fact # 21 at 3:27-28; Trial Exh. 186). Anova also changed its two page Clearsmoke® brochure to reflect the same information (Trial Exh. 186).  Anova took steps to correct any possible misleading nature of its advertisements as soon as it was raised in the TPI v. Kingford arbitration, but it was all based on Olson's erroneous assumption that Kingford actually did sell Clearsmoke® brand tuna.

43.    Despite the disclosures in the May 21, 2007 letter and the May 22, 2007 website change, no Kingford customer of FWS tuna through Anova ever stopped buying tuna from Anova (other than for normal business reasons).  In fact, even after Kingford discontinued production of FWS tuna in August of 2007 before the full implementation of the Clearsmoke® process, some of those Kingford FWS tuna customers asked if there were any way they could get more of the "good Philippine tuna" from Kingford.

44.    In mid-August, 2008, during early discovery in this case, Anova Inc. produced discovery responses that admitted that Kingford shipped Clearsmoke® Brand tuna from January 2006 to August 2007 when Kingford stopped producing FWS altogether.  However, those discovery responses were based on the same erroneous Olson assumptions that led to the May 21, 2007 letter and the change of the Anova BV Website and Clearsmoke® brochure on May 22, 2007.  Just days after these erroneous discovery responses (Trial Exhs. 209, 216) were served on King Tuna in mid-August 2008, Brinsmade learned from Hender Moran that no boxes from

1   Kingford ever bore the Clearsmoke® Brand logo, this was supported by other
2   evidence.

3       45.    There was no evidence introduced at trial that any tuna contained in
4   boxes shipped from Kingford were ever packaged as Clearsmoke® Brand FWS tuna.
5   (see Trial Exh. 1000 and attachments, including the Brinsmade deposition testimony).
6   That put King Tuna on notice that the early discovery admissions and the May 21,
7   2007 letter (Trial Exh. 186) and the May 22, 2007 website change (*Id*.) were not
8   accurate.  Mr. Randall Huff, Anova Inc.'s counsel, later sent an email on May 30,
9   2009 to Mr. Crowell withdrawing the prior erroneous discovery responses, and sent
10  supporting evidence in the form of Trial Exh. 1000, a year before this trial in May of
11  2010.  Therefore, King Tuna's good faith in continuing to prosecute this issue is
12  questioned.

13      46.    There was no false advertising based on King Tuna's late contention
14  that Anova falsely advertised that its tuna was fully "traceable" under its Quality
15  Control program.  King Tuna argued this traceability advertisement meant that Anova
16  should have traced the hickory chips sold to Kingford and had it done so, it would
17  have discovered much earlier that Kingford was not using hickory wood chips.
18  However, King Tuna failed to prove that traceability in the seafood industry means
19  what King Tuna claims.

## CONCLUSIONS OF LAW:

20
21

22      47.    Subject matter jurisdiction exists as to the Lanham Act claims by both
23  parties, and the Anova Inc. Counterclaims under the Lanham Act, 15 U.S.C. 1051 et
24  seq., the Patent Mismarking statute, 35 U.S.C. 292 et seq., and California Business
25  and Professions Code §§ 17200 et seq.

26      48.    The interim ruling of the USPTO in Trial Exhibit 60 is not relevant
27  because it is not a final agency action, nor is it binding on this proceeding, especially
28

given the finality of the Hawaii Claims Construction Order and related final judgments from the two Hawaii Cases. Any future decision from the USPTO cannot change the final judicial action in Hawaii in either Hawaii Case 1 or 2 for res judicata and issue preclusion purposes. It is appropriate to apply in the present action issue preclusion and res judicata from Hawaii Cases 1 and 2, including the Claim Construction Order (Trial Exh. 761) and the Federal Circuit's determination of the appeal of the Claim Construction Order (Trial Exh. 383), and the Court does so.

49.    Anova reasonably relied on a series of safeguards for ensuring that its suppliers of Clearsmoke® branded tuna were processing under the Clearsmoke® Process using Clearsmoke® FWS.

50.    None of the evidence from the TPI vs. Kingford arbitration is admissible in this proceeding as it fails to meet any exception to the hearsay rule and fails to qualify for issue preclusion or res judicata for reasons expressed more fully in Anova Inc.'s Motion In Limine #1 and in its Opposition Brief to King Tuna's original Motion in Limine #4, both filed in this case. King Tuna successfully moved to exclude Olson from the TPI arbitration hearings on the basis, *inter alia,* that he was a "nonparty" to the TPI arbitration. He only testified in the TPI arbitration as an expert witness for Kingford. Anova was not a party to the TPI arbitration. Further, Olson was never an officer, director or managing agent of Anova.

51.    King Tuna failed to meet its burden of proving by a preponderance of the evidence that any of its allegations constituted actionable false advertising under the Lanham Act, 15 U.S.C. 1051 et seq., or constituted unfair competition under California Business and Professions Code §§ 17200-17500 et seq. For those reasons, judgment will be entered against it in its Second Amended Complaint, with costs awarded to Anova Inc. A separate hearing will take place, currently set for July 13-16, 2010, on Anova's counterclaims and on issues of attorney's fees, damages, penalties and the amount of the cost awarded against plaintiff and any costs awarded

**FINDINGS OF FACT & CONCLUSIONS OF LAW**

on the counterclaims should Anova prevail.

52.     To the extent any of the Findings of Fact constitute Conclusions of Law, they are adopted as such.

Dated:_June 30, 2010_____                                    _____

                                                                                   Hon. Otis D. Wright, II,

                                                                                   United States District Judge

**FINDINGS OF FACT & CONCLUSIONS OF LAW**