O

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

| | |
|---|---|
| KING TUNA, INC., a California corporation,<br><br>            Plaintiff,<br>v.<br><br>ANOVA FOOD, INC., a Georgia corporation,<br><br>            Defendant. | Case No. CV07-07451 ODW (AJWx)<br><br>FINDINGS OF FACT AND CONCLUSIONS OF LAW AS TO ANOVA FOOD, INC.'S COUNTERCLAIMS |

The Court held a two-day bench trial from September 7, 2010 to September 8, 2010. The bench trial involved Defendant and Counterclaimant, Anova Food, Inc.'s ("Anova"), counterclaims against Plaintiff and Counter-Defendant, King Tuna, Inc. ("King Tuna"). Based on the evidence and testimony at trial and further post-trial briefing, the Court makes the following findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure:

## FINDINGS OF FACT

1. Anova filed counterclaims against King Tuna, a California corporation, alleging: (a) violations of the Lanham Act, 15 U.S.C. § 1051 *et seq.*, (b) false patent marking under 35 U.S.C. § 292 *et seq.*, and (c) violations of CAL. BUS. & PROF. CODE § 17200 *et seq.* Anova's allegations stem from its contention that King Tuna knew it was not processing its filtered wood smoke ("FWS") treated tuna according to U.S. Patent No. 5,484,619 ("the '619 patent").

2. King Tuna is licensed to practice the '619 patent. In addition, King Tuna and its affiliated company, Tuna Processors, Inc. ("TPI"), holds a license to the Philippine Patent No. I-31138 (the "Philippine patent") that is substantially similar to the '619 patent.

3. Kanemitsu Yamaoka ("Yamaoka"), one of the inventors of the '619 and the Philippine patents, instituted a patent infringement suit ("Philippine Infringement Action") at the request of King Tuna and TPI against Phillips Seafood before the Philippine Intellectual Property Office ("IPO"). The Philippine Infringement Action was dismissed on October 30, 2006.

### BACKGROUND FACTS AS TO KING TUNA

4. King Tuna was formed as a California corporation in late 2003. (PreTrial Conference Order dated April 19, 2010 ("PTCO") at 4:2.) Mr. Joaquin Lu ("Lu") is the majority owner of King Tuna. (PTCO at 4:15.)

5. Between January 1, 2004 and September 30, 2008, King Tuna imported and sold in excess of 7,109,000 pounds of tuna into the United States

(PTCO at 4:3-4.) Mr. Christian Tregillis ("Tregillis"), King Tuna's damages expert, submitted an adjusted amount: 7,222,787 pounds sold at an average price of $4.11 per pound with revenues of $29,685,655.00. Using Tregillis' adjusted data, sales of King Tuna's FWS tuna from October 30, 2006 to September 30, 2008 were 1,845,522 pounds with revenues of $7,585,095.00 and from August 27, 2007 to September 30, 2008 were 742,897 pounds with revenues of $3,053,308.00. (Tregillis Rebuttal Report 13 Nov 2009.)

6. Substantially all of King Tuna's seafood imported into the United States were from Citra Mina Seafood Corporation ("Citra Mina") and Mommy Gina Tuna Resources ("MGTR"), both located in the Philippines. (PTCO at 4:8-10.)

7. MGTR was a sole proprietorship under Lu until it was incorporated. (PTCO at 4:11-12.) Citra Mina owned the vast majority of the MGTR stock, and Lu and/or members of his family own a majority interest in Citra Mina. (PTCO at 4:13-14.) Thus, Lu and his family controlled King Tuna and its two suppliers, MGTR and Citra Mina, during the entire relevant damages period.

8. Lu became a member of TPI and had a vote in its operations in January 2003. Lu became the sole member of TPI no later than February of 2006 (Trial Tr. 9-8-10 at 1286:21 to 1287:1). From February of 2006, Lu was "effectively TPI" and "determined all of its strategies at that point" in consultation with Richard Friend ("Friend"), the Vice President of TPI. (Trial Tr. 5-7-10 at 493:12 to 494:10.)

**BACKGROUND FACTS AS TO ANOVA**

9. Since 1998, Anova was a Georgia corporation with its principal place of business in Tampa, Florida, and with its Quality Control office in Miami, Florida. (PTCO at 2:2-3.) Sometime between 1998 to 1999, Anova entered the business of selling seafood preserved with FWS, including FWS tuna products, in the United States. Anova continues in that same business today.

10. Anova sells its FWS tuna products under different "brands:" (a) the Anova brand, (b) the MyFish brand, (c) the Clearsmoke® brand, and (d) some

2

private label brands.

**FINDINGS AS TO PATENT FALSE MARKING VIOLATIONS**

11. The Court finds that King Tuna advertised that its FWS tuna was made in accordance to the '619 patent and marked its products accordingly. Specifically, King Tuna and its wholly-owned suppliers, MGTR and Citra Mina and their successors-in-interest, marked and advertised that all King Tuna's FWS tuna sold in the United States were produced under the '619 patent during the relevant period.

12. Lu admitted at trial that he told all his customers from the beginning that the FWS tuna was protected by the '619 patent:

> "Q: BY MR. HUFF: Didn't you want to tell your customers that you were making this tasteless smoke under the '619 patent that was earlier than Yamaoka [sic: Kowalski's patent] so they wouldn't worry about infringement suits from Kowalski? A: Yes, Mr. Huff. We tell them that. * * * Q: But … the '619 patent … was reduced to practice by Pescarich? A: Yes, Mr. Huff. Q: And you were telling them that; right? A: Yes. This is how the '619 patent was reduced to practice, Mr. Huff." (Trial Tr. 9-8-10 at 1299:3-25.)

13. Byron Easley ("Easley"), King Tuna's Sales and Marketing Director, testified he gave the Point of Sale brochure (Trial Exh. 621, p. 2) to all the customers and potential customers during the entire time of his employment with King Tuna. (May 6, 2010 Trial Tr. at 325:6-12; 393:14 to 394:18.) Particularly, Easley testified that marketing the tuna "as consistent with a patented process" of the '619 patent was a "key" part of their marketing. (Trial Tr. 5-6-10 at 325:6-12; 393:14 to 394:18.) He testified how important the '619 patent was to his customers: "I think the ability to establish that there was a patent and that we had the patent was an important way of establishing our credibility." (*Id.* at 394:10-14; Trial Exh. 621, p. 2.[1])

---

[1] Trial Exh. 621, p. 2 provides that King Tuna "utilizes 'original' Filtered Wood Smoke licensed under two U.S. Patents. This technology is applied to [King Tuna's] highest quality brand - King

3

14. Easley worked at King Tuna from 2004 to 2009 covering the relevant time period in this case.

15. No evidence exists that these advertisements were corrected or modified during the entire time Easley worked at King Tuna until King Tuna stopped selling FWS tuna in the United States after September 30, 2008.

16. King Tuna stipulated in the PTCO that prior to September 2008 it advertised that its FWS tuna was made with the '619 patent (PTCO at 5:10-11), and that "King Tuna advertised that it preserved its filtered wood smoke tuna by use of the Yamaoka '619 patent, and that it marked and marketed product treated with filtered wood smoke as protected by U.S. Patent No. 5,484,619." (PTCO at 4:26-28.)

17. King Tuna was aware that these advertisements were false in, at least one way: King Tuna never pre-cooled the FWS smoke down to 0º to 5º C before applying it to the tuna to be treated with FWS, as required by the '619 patent.

18. The '619 patent had three "steps" to complete its one independent claim for making FWS: (a) it must be made within a temperature range of 250º to 400º C; (b) it must be filtered to remove "mainly the tar;" and (c) it must be precooled to 0º to 5º C and remain at that extra-low temperature when applied to the tuna. (Trial Exh. 651, p. 8.)

19. Lu admitted that he received notices by judicial bodies construing the '619 patent's one independent claim that showed the requirement of the cooling step.

20. The first such notice was in the year 2002, when Lu admitted that he read the '619 patent's drawings, and saw that the drawing required a cooling chamber that cooled down the smoke that was then piped directly to the smoking chamber where the precooled smoke was to be applied to the tuna. Lu admitted he knew this was different from the process his companies always implemented.

---

Tuna as the best means of preserving fish color under household refrigeration. 1) U.S. Pat. #5,484,619 - extends shelf life under household refrigeration. Inventor: Kanemitsu Yamaoka of Japan, 01/16/96. Process fully FDA/USDC compliant."

21. Lu admitted he knew from the beginning that they only cooled the FWS down to ambient temperatures in the Philippines. The smoke was then placed in large, yellow bags for storage in the "yard" around the plant in the Philippines until actually used in processing.

22. Regarding the Philippine Infringement Action, Lu admitted he knew of an interim ruling in July 2004 when the Philippine IPO ruled against Yamaoka and found no infringement by Phillips Seafood of the Philippine Patent. The IPO ruled that the Philippine Patent required the smoke to be precooled to 0º to 5º C before application to the tuna.

23. Lu admitted that he and TPI asked Yamaoka, inventor of the '619 patent and the similar Philippine Patent, to litigate the infringement claim on behalf of TPI against Phillips Seafood, shortly after they were licensed to use the '619 and Philippine Patents.

24. Lu admitted that TPI's members, including Lu's MGTR, funded and controlled the Philippine Infringement Action against Phillips Seafood through TPI.

25. After February 2006, Lu admitted he was "effectively TPI" and "determined all of its strategies at that point" in consultation with Friend, the Vice President of TPI. (Trial Tr. 5-7-10 at 493:12 to 494:10; *see also* Trial Tr. 9-8-10 at 1286:21 to 1287:1.) Lu testified Yamaoka was a director and a minority shareholder of TPI. (*See, e.g.,* Trial Tr. 9-8-10 at 1287:10-23.)

26. On October 30, 2006, the Philippine IPO dismissed the Philippine Infringement Action against Phillips Seafood, confirming its earlier interim ruling in July 2004 that the Philippine Patent was not infringed by Phillips Seafood, because, *inter alia*, the Philippine Patent required the FWS to be precooled to 0º to 5º C. (Trial Exh. 905.)

27. Lu admitted during the May 2010 bench trial that he was aware of this October 30, 2006 ruling at the time and that this gave him "notice" that the Philippine Infringement Action against Phillips Seafood was dismissed and that

"your claims as you were construing them weren't accepted by . . . [ ] the Philippine, [IPO]." (Trial Tr. May 7, 2010 at 505:14-20; 496:19 to 497:21.)

28. Lu, as the acting President and the only member of TPI, should have received notice of the October 30, 2006 ruling of the Philippine IPO dismissing the Philippine Infringement Action against Phillips Seafood.

29. Lu testified he consulted with Richard Friend regarding TPI's strategies after February 2006. Friend wrote in September 2000 that at Pescarich they were not following the cooling step of the '619 patent because it had "commercial shortcomings" and instead eliminated the precooling chamber and the precooling step entirely. (Trial Exh. 907, p. 8, ¶ 32 at 9, ¶ 35.) Lu admitted that King Tuna followed the same Pescarich process for smoking their tuna.

30. On August 27, 2007, in response to the Court's own inquiry as to when Lu became aware that he was not following the cooling step, Lu stated:

> THE COURT: And what was the *earliest time you became aware that in order to correctly follow the '619 patent, you needed to precool the smoke* before applying it to the fish. When was the first time you learned that? THE WITNESS: I learned that in the East Asia arbitration case, your Honor. THE COURT: And the date on that was when? Or even the year? THE WITNESS: *August of 2007, your Honor.* (Trial Tr. 9-8-10 at 1306:19 to 1307:4; italics added).

### FINDINGS AS TO LANHAM ACT FALSE ADVERTISING VIOLATIONS

31. King Tuna admits that its advertisements were not true because they never made FWS tuna according to the cooling step of the '619 patent.

32. At least as of October 30, 2006, King Tuna should have known that the '619 required a cooling step, which King Tuna does not implement in its own processes.

33. King Tuna represented to his customers that King Tuna's FWS tuna was made pursuant to the '619 patent. In addition, Easley testified that King Tuna's

6

advertisements claiming that its FWS tuna were all made with the '619 patent were "key" and important to establish "credibility" with all the customers and potential customers of King Tuna.

34.  Easley admitted that all customers and potential customers were shown the Point of Sale brochure (Trial Exh. 621, p. 2), and that many of these customers and potential customers were from a number of states in the United States.

35.  Anova has been injured as a result of the false statements as at least some of its customers left Anova and became King Tuna's customers.

36.  To the extent any findings of fact constitute conclusions of law, they are adopted as such.

## CONCLUSIONS OF LAW

1.  Subject matter jurisdiction exists to try Anova's counterclaims under the Lanham Act, 15 U.S.C. § 1051 *et seq.*, 35 U.S.C. § 292 *et seq.*, and CAL. BUS. & PROF. CODE §§ 17200 *et seq.*  Also, venue is proper in this judicial district.

2.  As an initial matter, the Court finds that King Tuna had knowledge of the fact that the '619 patent required a cooling step as of October 30, 2006.  It is undisputed that TPI and Yamaoka were given notice of the Philippine IPO's final determination ruling that the Philippine patent required the precooling step. At this time, Lu was TPI's sole member and determined all its strategies in consultation with Friend.  Lu also funded and controlled the Philippine Infringement Action.  As such, by October 30, 2006, the Court finds that TPI, Yamaoka, and Lu knew or should have known that the Philippine and '619 patents required the precooling step.  The Court is aware of the record showing that Lu may have known that the '619 patent required steps that King Tuna was not implementing prior to October 30, 2006. Nevertheless, the Court finds the October 30, 2006 date more appropriate as all pertinent persons and entities related to Lu and King Tuna undoubtedly should have been on notice of what actually is required of the '619 patent.  Accordingly, the false marking and advertising could not have been a mere innocent oversight as of

October 30, 2006. *See Bibow v. Am. Saw and Mfg. Co.*, 490 F. Supp. 2d 128, 129 (D. Mass. 2007) (citing *Arcadia Mach. & Tool, Inc. v. Sturm, Ruger & Co., Inc.*, 786 F.2d 1124, 1125 (Fed. Cir. 1986) ("[A]s the statute indicates, deceptive intent, and not mere innocent oversight, is a critical element of any claim under § 292."). Consequently, the relevant damages period shall run from October 30, 2006 to September 30, 2008.

## ANOVA'S COUNTERCLAIMS

3. Section 292 states that whoever "uses in advertising in connection with any unpatented article, the word 'patent' or any word or number importing that the same is patented, for the purpose of deceiving the public ... [s]hall be fined no more than $500 for every such offense." 35 U.S.C. § 292. Accordingly, the elements in a patent marking claim are: (1) a marking or advertising that an object is patented (2) falsely (3) regarding an unpatented article (4) with intent to deceive the public. *Mayview Corp. v. Rodstein*, 620 F.2d 1347, 1359 (9th Cir. 1980). All elements have been established in this case. It is undisputed that at least as of October 30, 2006, King Tuna knew that its FWS tuna processing steps did not include the method embodied in the '619 patent. Marking and advertising their FWS tuna and other products, despite this knowledge from October 30, 2006 to September 30, 2008, satisfies the elements for patent false marking.

4. "The elements of a Lanham Act § 43(a) false advertising claim are: (1) a false statement of fact by the defendant in a commercial advertisement about its own . . . product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a lessening of the goodwill associated with its products." *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997) (citations

8

omitted). Here, all elements have been established. At least as of October 30, 2006, King Tuna admits that its advertisements were not true because they never made FWS tuna according to the cooling step of the '619 patent. Despite knowing that the processes embodied in the '619 patent were not properly applied in its products, Lu informed his customers otherwise. Also, King Tuna's marketing director, Easley, testified that King Tuna's advertisements claiming its FWS tuna were made with the '619 patent was "key" and important to establish "credibility" with all the customers and potential customers of King Tuna. Further, Easley admitted that all customers and potential customers were shown the Point of Sale brochure with the false advertisements (Trial Exh. 621, p. 2), and that many of these customers were from a number of states in America. Lastly, at least some of Anova's customers left Anova and became King Tuna's customers. Hence, the requirements of Anova's false advertising claim are met.

    5. To be considered a "patented" article, all steps of at least one independent patent claim must be used. *Clontech Labs., Inc. v. Invitrogen Corp.*, 406 F.3d 1347, 1352 (Fed. Cir. 2005). King Tuna's FWS tuna sold in America were not patented according to the '619 patent because at least one of the steps, the cooling step, of its one independent patent claim was not followed.

    6. "A patentee's allegedly false representation of patent infringement is not actionable under § 43(a), but that a patentee's allegedly false representation that it is the exclusive source of a certain type of product because of its patent is so actionable." *Zenith Elecs. Corp. v. Exzec, Inc.*, 182 F.3d 1340, 1344 (Fed. Cir. 1999); *DP Wagner Mfg, Inc. v. Pro Sys., Inc.*, 434 F. Supp. 2d 445, 461 (S.D. Tex. 2006).

    7. Bad faith must be alleged for a Lanham Act claim, based solely on a false patent marking claim under 35 U.S.C. § 292, to survive. *See DP Wagner Mfg, Inc., supra* at 461 ("Although DP Wagner does not use the words 'bad faith,' DP Wagner does allege that Pro Patch marked its products with inapplicable patents

9

despite knowing that those patents did not cover the marked products.  Such conduct, if true, would be evidence of bad faith sufficient to plead patent mismarking.").

8. In *Clontech Labs. v. Invitrogen Corp.,* 406 F.3d 1347, 1352-53 (Fed. Cir. 2005), the Federal Circuit explained that the standard for proving intent to deceive for false patent marking purposes under 35 U.S.C. § 292 is an *objective* standard, not a purely subjective standard.  As such, objective standards control and the fact of misrepresentation coupled with proof that the party making it had knowledge of its falsity is enough to warrant drawing the inference that there was a fraudulent intent.  *Id*. at 1352-53.  In this case, King Tuna and Lu had knowledge that their FWS Tuna did not embody the processes of the '619 patent by October 30, 2006.  King Tuna's continued misrepresentations to its customers despite this knowledge after October 30, 2006 warrant an inference of bad faith.

9. For the foregoing reasons, Anova's counterclaims have been established in this case.[2]

## **ANOVA'S DAMAGES**

10.  Anova's expert demonstrated that King Tuna sold a total of 1,845,522 pounds from October 30, 2006 to September 30, 2008 at revenues of $7,585,095.00 for a profit of $1,517,019.00 using the 20% profit margin King Tuna provided in damages report.  Thus, the Court awards unjust enrichment damages of $1,517,019.00 to Anova for King Tuna's Lanham Act violations.  *See Maier Brewing Co. v. Fleischmann Distilling Corp*., 390 F.2d 117, 123-24 (9th Cir. 1968).

11.  Pursuant to 35 U.S.C. § 292, the Court has discretion to assess a penalty

---

[2]  Anova failed to discuss its claim under California Unfair Competition Law, CAL. BUS. & PROF. CODE § 17200, et seq.  Nevertheless, the Court finds that liability standards and damages for claims arising under the California Unfair Competition Law are Asubstantially congruent to claims made under the Lanham Act.  *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1153 (9th Cir. 2002).  Money damages are not available under § 17200; only equitable relief, including restitution and disgorgement are available.  *See Vikco Ins. Servs. v. Ohio Indem. Co*., 70 Cal. App. 4th 55, 82 (Ct. App. 1999).  As such, King Tuna is liable pursuant to § 17200 to the extent it has been found liable under the Lanham Act.  In addition, relief pursuant to § 17200 shall not be permitted to the extent it calls for double recovery in conjunction with the Lanham Act violations.

1. of $500.00 per violation, but must do so on a "per article" basis if patent false marking liability is established. *Forest Group, Inc. v. Bon Tool Co.,* 590 F.3d 1295, 1302-03 (Fed. Cir. 2009).

12. FWS tuna is individually packaged and sold as steaks in 4 oz., 6 oz., 8 oz., 10 oz. and less frequently 12-14 oz. sizes. Accordingly, the Court designates one pound per article as the metric in determining the penalty and assesses a penalty of $1.00 per article. King Tuna sold 1,845,522 pounds of FWS tuna during the relevant period. Hence, the total penalty is $1,845,522.00.

13. Pursuant to the false patent marking statute, half of that penalty will go to Anova for prosecuting the *qui tam* action, and the other half will go to the United States Treasury. *See* 35 U.S.C. § 292(b).

14. Attorneys' fees and costs of suit will be determined by motion after the Court enters its ruling on these proposed findings and conclusions of law.

15. To the extent any of the above conclusions of law constitute findings of fact, they are adopted as such.

16. Anova shall file a proposed judgment based on this Order and the Court's Findings of Fact and Conclusions of Law dated June 30, 2010. (Dkt. No. 456.)

IT IS SO ORDERED.

Dated: February 24, 2011   _____

Hon. Otis D. Wright, II,
United States District Judge

11